811 F.2d 401
 55 USLW 2480, 16 Soc.Sec.Rep.Ser. 266,
Medicare&Medicaid Gu 36,062
 Soung O. KWOUN et al., Appellees,
v.
SOUTHEAST MISSOURI PROFESSIONAL STANDARDS REVIEW
ORGANIZATION et al., Appellants.
Soung O. KWOUN et al., Appellants,
v.
SOUTHEAST MISSOURI PROFESSIONAL STANDARDS REVIEW
ORGANIZATION et al., Appellees.
 Nos. 85-2379, 86-1502 and 86-1838.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 10, 1986.
Decided Feb. 4, 1987.
Rehearing and Rehearing En Banc Denied March 9, 1987.
 
 1
 Louis Gilden, St. Louis, Mo., for appellants.
 
 
 2
 Robert Zener, Washington, D.C., Mark Packer, St. Louis, Mo., and Jerry L. Short, Jefferson City, Mo., for appellees.
 
 
 3
 Before HEANEY and BOWMAN, Circuit Judges, and ARNOLD,* District Judge.
 
 
 4
 MORRIS SHEPPARD ARNOLD, District Judge.
 
 
 5
 The U.S. Department of Health and Human Services (HHS) oversees Medicare payments to doctors and hospitals. See 42 U.S.C. Sec. 902, Sec. 1395kk(a). As part of its oversight responsibilities, HHS is authorized to exclude doctors and hospitals from eligibility for Medicare payments if services have been provided that are substantially in excess of need or fail to meet professional standards. See 42 U.S.C. Sec. 1395y(d)(1)(C). To determine whether to exclude doctors and hospitals from eligibility, HHS uses reports submitted by regional and statewide peer review organizations. See 42 U.S.C. Sec. 1395y(g). The HHS office with the specific responsibility for making such determinations is called the Health Care Financing Administration (HCFA).
 
 
 6
 In December, 1978, HCFA notified the regional peer review group for southeastern Missouri[1] that the patient discharge rates in that region indicated the possibility of abuses in claims for Medicare payments. The regional peer review group began an investigation that eventually focused on the Poplar Bluff Hospital and the doctors with admitting privileges there. Soung Kwoun is one of those doctors.[2] Following the investigation, the regional peer review group recommended to the statewide peer review group[3] that the hospital change some of its procedures and that Dr. Kwoun be excluded from eligibility for Medicare payments for ten years. The statewide peer review group adopted the recommendation of the regional peer review group and then transmitted the report and recommendations to HCFA in March, 1980.
 
 
 7
 In September, 1980, HCFA notified Dr. Kwoun of the recommendation and advised him of his right to oppose it. After an informal hearing in December, 1980, and additional consideration of the peer review group report and Dr. Kwoun's responses to it, HCFA adopted the recommendation. In September, 1981, HCFA officially excluded Dr. Kwoun from eligibility for Medicare payments for a period of ten years. Dr. Kwoun then asked for a formal hearing before an administrative law judge. The administrative law judge reversed the exclusion, citing procedural and substantive errors by HCFA, especially the reliance of HCFA on informal discussions with members of the regional peer review group as the basis for excluding Dr. Kwoun. The administrative law judge then ordered Dr. Kwoun's reinstatement to eligibility for Medicare payments.
 
 
 8
 Dr. Kwoun subsequently brought this action against certain HCFA employees, members of the regional and statewide peer review groups, two state officials involved in state proceedings brought against Dr. Kwoun as a result of the recommendation of the peer review group, and the insurance company that administers the Medicare payments program under contract with the government.[4] Dr. Kwoun claimed that the HCFA employees[5] deprived him of certain property and liberty interests without due process and subjected him to malicious prosecution and extreme and outrageous conduct. He asserted that the members of the regional and statewide peer review groups[6] and the state officials deprived him of equal rights under the law to make and enforce contracts and conspired to deprive him of the equal protection of the laws. His complaint against the peer review group members and the state officials also contained counts for malicious prosecution and extreme and outrageous conduct. Finally, Dr. Kwoun claimed that the state officials deprived him of certain property and liberty interests without due process.
 
 
 9
 The HCFA employees moved for summary judgment on the basis of absolute immunity. The district court denied the motion. Three of the HCFA employees appeal the denial of absolute immunity.[7] While the HCFA employees' appeal was pending, the district court dismissed, 632 F.Supp. 1091, sua sponte, the case against all defendants on the ground of qualified immunity. The plaintiffs appeal these dismissals. We affirm the orders of dismissal of all defendants but do so on the ground of absolute rather than qualified immunity.
 
 I.
 
 10
 We turn first to the federal defendants--the HCFA employees. Defendant Frank Kram is the HCFA employee who reviewed the peer review group report and accepted its recommendation to exclude Dr. Kwoun from eligibility for Medicare reimbursement. Defendant Don Nicholson is the HCFA employee who signed the notice of proposed exclusion; defendant Ralph Howard is the HCFA employee who signed the final decision excluding Dr. Kwoun. Apparently the acts of defendant Kram are the primary focus of attention; the complaint is cryptic on this point, and the only specific allegation against defendants Nicholson and Howard in the plaintiffs' brief is that their conduct "was in a line with the earlier conduct of Kram * * * and furthered and reinforced the previous lack of arms' length dealing."
 
 
 11
 While the regional peer review group was investigating Dr. Kwoun, but before it submitted its report to HCFA, defendant Kram apparently met with the members of the investigating committee in the offices of the statewide peer review group and discussed the investigation of Dr. Kwoun. The administrative law judge found that the report of the peer review group did not meet the substantive due process requirements set forth in the applicable policy manual and federal regulations. He found in addition that Dr. Kwoun had been denied substantive due process because defendant Kram's adoption of the recommendation to exclude him from eligibility for Medicare payments was based at least in part on defendant Kram's discussions with members of the regional peer review group before the report was issued and not on the report itself.[8]
 
 
 12
 Barr v. Matteo, 360 U.S. 564, 575, 79 S.Ct. 1335, 1341, 3 L.Ed.2d 1434 (1959) (plurality opinion), grants absolute immunity from common-law tort claims to federal officials acting "within the outer perimeter of [their] line of duty." Our court has described absolute immunity from common-law torts as applying to acts connected " '* * * more or less * * * with the general matters committed by law to the officer's control or supervision, and not * * * manifestly or palpably beyond his authority.' " Bushman v. Seiler, 755 F.2d 653, 655 (8th Cir.1985), quoting Norton v. McShane, 332 F.2d 855, 859 (5th Cir.1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965). The plaintiffs contend that defendant Kram (and by extension defendants Nicholson and Howard, those officials having relied on defendant Kram's recommendation) acted outside the scope of his authority because defendant Kram was involved in discussions with members of the regional peer review group before its report was issued.
 
 
 13
 The first mention of HCFA in the regulations governing the imposition of exclusion sanctions under the Medicare program provides that a peer review group is to submit a report on violations to HCFA after an investigation of possible violations. See 42 C.F.R. Sec. 474.3(b), Sec. 474.8(a). Following submission of a peer review group report, HCFA is to determine whether a violation has occurred and is to provide notice to the alleged violator of the proposed exclusion. See 42 C.F.R. Sec. 474.10(a), Sec. 474.10(c). There is no mention of HCFA involvement prior to the issuance of a peer review group report.
 
 
 14
 On the other hand, there is no explicit prohibition of such involvement either. Furthermore, HHS is charged with the duty of "promoting the effective, efficient, and economical delivery of health care services, and of promoting the quality of services of the type for which [Medicare] payment may be made." See 42 U.S.C. Sec. 1395y(g). HHS also has the authority to contract with peer review groups in order to carry out its duties. Id. All parties agree that it was HCFA that notified the regional peer review group of data indicating possible Medicare abuses. It seems apparent, then, that any involvement of HCFA employees in a peer review group investigation after that notification would be within the scope of their authority.
 
 
 15
 Even if acceptance of the recommendation to exclude was based on improper factors (such as consideration of matters outside the peer review group report), that does not make the earlier actions of the HCFA employees outside the scope of their authority; it merely makes the acceptance of the recommendation incorrect. The federal defendants are therefore entitled to absolute immunity from common-law tort claims.
 
 
 16
 A more difficult question is how to categorize the purpose of the duties of the HCFA employees in the context of the process for imposing exclusion sanctions on possible violators of the rules governing Medicare payments.[9] The courts have recognized that the reasons for granting absolute immunity to federal officials from common-law tort claims--to protect them "in the execution of their federal statutory duties from criminal or civil actions based on state law," Butz v. Economou, 438 U.S. 478, 489, 98 S.Ct. 2894, 2902, 57 L.Ed.2d 895 (1978)--do not apply to claims based on violations of constitutional law. Id. at 495, 98 S.Ct. at 2905.
 
 
 17
 In most cases, "federal executive officials exercising discretion are entitled only to * * * qualified immunity" from constitutional claims. Id. at 507, 98 S.Ct. at 2911. Absolute immunity from constitutional claims is to be granted only in "those exceptional situations where it is demonstrated that [such] immunity is essential for the conduct of the public business." Id. The determination of when such exceptional situations exist is a " 'functional' " one, Harlow v. Fitzgerald, 457 U.S. 800, 810, 102 S.Ct. 2727, 2734, 73 L.Ed.2d 396 (1982), and "[t]he burden of justifying absolute immunity rests on the official asserting the claim." Id. at 812, 102 S.Ct. at 2735.
 
 
 18
 "[J]udicial, prosecutorial, and legislative functions require absolute immunity," id. at 811, 102 S.Ct. at 2734, and therefore "agency officials performing certain functions analogous to those of a prosecutor"[10] are entitled to absolute immunity. Butz, 438 U.S. at 515, 98 S.Ct. at 2915. The Supreme Court has held only that in "initiating a prosecution and in presenting the [case against the defendant]"--those prosecutorial functions "intimately associated with the judicial phase" of his duties--is a prosecutor entitled to absolute immunity. Imbler v. Pachtman, 424 U.S. 409, 430-31, 96 S.Ct. 984, 944-95, 47 L.Ed.2d 128 (1976). Whether a prosecutor acting as "an administrator or [an] investigative officer rather than * * * an advocate" is entitled to absolute immunity is a question that the Court has expressly reserved. Id.
 
 
 19
 The federal defendants argue that the process of deciding whether to impose exclusion sanctions on a person under the Medicare program is analogous to an agency decision on whether to initiate administrative proceedings against a person in order to suspend or revoke his federal registration as a commodities futures merchant, see Butz, 438 U.S. at 481, 98 S.Ct. at 2897, or in order to impose professional disciplinary sanctions, see Austin Municipal Securities, Inc. v. National Association of Securities Dealers, Inc., 757 F.2d 676, 689 (5th Cir.1985). They therefore argue that actions taken prior to the formal hearing before the administrative law judge (defendant Kram's allegedly improper consultation with members of the regional peer review group in January, 1980, and the failure to give adequate notice to Dr. Kwoun in December, 1979, of the fact that he was being considered for exclusion sanctions) occurred in the context of essentially advocatory prosecutorial duties--"deciding whether a proceeding should be brought and what sanctions should be sought," Butz, 438 U.S. at 515, 98 S.Ct. at 2915, against "a specific target," Gray v. Bell, 712 F.2d 490, 501 (D.C.Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984).
 
 
 20
 We agree. The statutes and regulations governing the exclusion sanctions process obviously anticipate the possibility of a formal adjudicative hearing before an administrative law judge designated by the appeals council of HHS. See 42 U.S.C. Sec. 1395y(d)(3) and 42 C.F.R. Sec. 474.10(g)(1), Sec. 405.1533. The hearing is de novo, and HCFA has the burden of proof. Appeal of the decision of the administrative law judge is to the appeals council of HHS. See 42 C.F.R. Sec. 405.1561. Judicial review of the appeals council decision is a possibility. See 42 U.S.C. Sec. 1395y(d)(3).
 
 
 21
 The federal defendants further argue that their alleged misconduct during the formal hearing before the administrative law judge was clearly advocatory. We agree. An agency official's presentation of evidence in an agency hearing is protected for the same reasons that a prosecutor's presentation of evidence before a court is protected. Butz, 438 U.S. at 517, 98 S.Ct. at 2916.
 
 
 22
 Because the actions of the federal defendants at all relevant times were prosecutorial in nature, those defendants are entitled to absolute immunity from constitutional claims. The dismissal orders of the district court as to the federal defendants are therefore affirmed.
 
 II.
 
 23
 The SEMO defendants include the regional peer review corporate body, the statewide peer review corporate body, the directors and officers of both groups, the regional peer review group representative to the statewide peer review group, the members of the regional peer review group investigation oversight committee, the Poplar Bluff Hospital review coordinator for the regional peer review group, the physician advisers to Poplar Bluff Hospital appointed by the regional peer review group, and the members of the regional peer review group investigating team specifically assigned to Dr. Kwoun.[11] These defendants argue that because they were participating in a review process established and governed by federal law, they are federal actors for the purpose of any analysis of their activities in relation to the investigation of Dr. Kwoun. We agree.
 
 
 24
 HHS is authorized to contract with peer review groups to carry out its duty to promote "the effective, efficient, and economical delivery of health care services, and [to promote] the quality of services of the type for which [Medicare] payment may be made." See 42 U.S.C. Sec. 1395y(g). Medicare payments may not be made for items or services that are not "reasonable and necessary for the diagnosis or treatment of illness or injury." See 42 U.S.C. Sec. 1395y(a)(1)(A). When a peer review group does undertake such a contract, the peer review group "must * * * review some or all of the professional activities * * * of physicians * * * in the provision of health care services and items for which [Medicare] payment may be made * * * for the purpose of determining whether * * * [those] services and items are * * * reasonable and medically necessary and whether such services and items are not allowable under * * * section 1395y." See 42 U.S.C. Sec. 1320c-3(a)(1)(A). The peer review group is to determine, on the basis of its review, whether Medicare payments are to be made for the services reviewed. See 42 U.S.C. Sec. 1320c-3(a)(2). The determination of the peer review group is conclusive as to Medicare payments unless it is changed by reconsideration of the peer review group.[12] See 42 U.S.C. Sec. 1320c-3(a)(2)(C). In other words, HHS essentially uses the peer review group as a consultant that recommends whether or not a doctor should continue to be eligible for Medicare reimbursements.
 
 
 25
 Consultants who investigate whether the services provided by doctors are necessary and eligible for Medicare reimbursement have been held to be "governmental agents for immunity purposes." Bushman v. Seiler, 755 F.2d 653, 655 (8th Cir.1985) (defendant was consultant to insurance company that was Medicare carrier for HHS). See also Gross v. Sederstrom, 429 F.2d 96, 99 (8th Cir.1970) (defendants were elected committee members who investigated farmer's eligibility for grain program for federal Agricultural Stabilization and Conservation Service; held to be federal officials for immunity purposes in suit resulting from denial of farmer's application for participation). The SEMO defendants were therefore acting as federal officials for immunity purposes.
 
 
 26
 As federal officials for the purpose of an analysis of eligibility for immunity, the SEMO defendants are immune from common-law tort claims if their actions were not " ' * * * manifestly or palpably beyond [their] authority.' " Bushman, 755 F.2d at 655, quoting Norton v. McShane, 332 F.2d 855, 859 (5th Cir.1964), cert. denied, 380 U.S. 981, 85 S.Ct. 1345, 14 L.Ed.2d 274 (1965). The plaintiffs apparently concede that the actions of the SEMO defendants were within the authority given by the statute, since their argument concentrates on the assertion that the SEMO defendants are not federal officials. Furthermore, although the administrative law judge found that the peer review group report was deficient and even inaccurate in several respects, he made no finding that the SEMO defendants had investigated Dr. Kwoun in any manner not authorized by statute or by their contract with HHS. We hold, therefore, that the SEMO defendants are absolutely immune from the common-law tort claims asserted against them.
 
 
 27
 The SEMO defendants argue that they are also entitled to immunity from constitutional claims because their actions were essentially prosecutorial in nature. They contend that the peer review groups are analogous to the professional organizations to whom absolute immunity from constitutional claims has been granted when disciplinary actions have resulted in a lawsuit by the person disciplined. See, e.g., Austin Municipal Securities, Inc. v. National Association of Securities Dealers, Inc., 757 F.2d 676, 689 (5th Cir.1985) (prosecutorial and adjudicative functions of securities dealers' association disciplinary committee); Clulow v. State of Oklahoma, 700 F.2d 1291, 1298 (10th Cir.1983) (prosecutorial function of bar disciplinary committee); and Simons v. Bellinger, 643 F.2d 774, 782 (D.C.Cir.1980) (prosecutorial and adjudicative functions of bar committee on unauthorized practice of law). We agree.
 
 
 28
 Peer review groups that are eligible to contract with HHS must be "composed of a substantial number of the licensed doctors of medicine and osteopathy engaged in the practice of medicine or surgery in the area and who are representative of the practicing physicians in the area" and must be judged by HHS to be "able * * * to perform reviews of the pattern of quality of care in an area of medical practice where actual performance is measured against objective criteria which define acceptable and adequate practice." See 42 U.S.C. Sec. 1320c-1(1)(A), Sec. 1320c-1(2). In conducting reviews under contract with HHS, the peer review groups are to "apply professionally developed norms of care, diagnosis, and treatment based upon typical patterns of practice within the [relevant] geographic area * * * taking into consideration national norms where appropriate." See 42 U.S.C. Sec. 1320c-3(a)(6). The norms with respect to treatment for particular illnesses or health conditions are to include "the types and extent of the health care services which * * * are considered within the range of appropriate diagnosis and treatment of such illness[es] or health condition[s], consistent with professionally recognized and accepted patterns of care." See 42 U.S.C. Sec. 1320c-3(a)(6)(A).
 
 
 29
 In other words, the medical peer review groups are organizations of professionals charged with the task of evaluating the performance of members of their profession. Thus, although medical peer review groups are not associations of professionals supervised by a licensing body, see, e.g., Austin Municipal Securities, Inc., 757 F.2d at 680, and Clulow, 700 F.2d at 1297, they are nonetheless very similar to such associations. Furthermore, although medical peer review groups do not control a professional's ability to practice in all contexts, see, e.g., Simons, 643 F.2d at 781 (bar committee has power to disbar attorneys), they do control to some extent a professional's ability to practice in a particular class of cases--those that involve claims for Medicare reimbursement. See 42 U.S.C. Sec. 1320c-3(a)(2)(C), Sec. 1395y(d)(3) (determination of peer review group on eligibility for Medicare reimbursement is conclusive unless changed by reconsideration of peer review group, formal hearing decision of administrative law judge, decision of appeals council of HHS, or judicial review). Thus medical peer review groups are very similar to bar committees that control whether a lawyer may practice before certain courts. See, e.g., Simons, 643 F.2d at 775.
 
 
 30
 Absolute immunity from even constitutional claims was granted to the securities dealers' association disciplinary committee in Austin Municipal Securities, Inc., 757 F.2d at 689, and to the bar disciplinary and practice committees in Clulow, 700 F.2d at 1298, and Simons, 643 F.2d at 782. Such immunity was granted because each committee's function shared the characteristics of the judicial process, because an unfavorable recommendation from each committee had the potential of provoking a retaliatory lawsuit, and because the subject of each committee's actions had adequate opportunity to challenge those actions through judicial review. See Austin Municipal Securities, Inc., 757 F.2d at 689, Clulow, 700 F.2d at 1298, and Simons, 643 F.2d at 782, all incorporating the tests specified in Butz v. Economou, 438 U.S. 478, 513 and 515-16, 98 S.Ct. 2894, 2914 and 2915-16, 57 L.Ed.2d 895 (1978).
 
 
 31
 We find that the review activities of the medical peer review groups at issue here--those entrusted to them by Congress so that the Medicare program can function effectively, efficiently, and economically, see 42 U.S.C. Sec. 1395y(g)--are similar enough to the review activities of the disciplinary and practice committees declared to be immune in the cases discussed above that similar protection should be extended.[13]
 
 
 32
 We are not unmindful of the problems that may arise from the extension to medical peer review groups of absolute immunity from both common-law tort claims and constitutional claims. We are convinced, however, that in order for the Medicare program to work effectively, efficiently, and economically, see 42 U.S.C. Sec. 1395y(g), some controls on quality of care must be exercised. We are also convinced that the exercise of controls on quality of care greatly increases the benefits derived from the Medicare program by both the individual Medicare patients and our society as a whole. We are further convinced that the only way to ensure both the effectiveness of the peer review system and the willingness of private doctors to participate in it is to insulate them from damage claims that may result from that work. The alternative to the use of private doctors to review medical decisions is the use of agency officials, who are much less likely to possess the expertise to evaluate such medical decisions. The use of agency officials to review medical decisions would almost certainly lead to a far less effective, efficient, and economical Medicare program. In short, we are convinced that absolute immunity is "essential for the conduct of the public business," Butz, 438 U.S. at 507, 98 S.Ct. at 2911, in this critical health care area. The availability of administrative and judicial review serves as a check against abuse of the power inherent in the peer review system and against mistakes or sloppiness in that system. A further check over the long run is the power of HHS to terminate its contract with any peer review group.[14] See 42 U.S.C. Sec. 1320c-2(c)(6).
 
 
 33
 We therefore hold that the SEMO defendants are absolutely immune from constitutional claims as well as common-law tort claims. The dismissal orders of the district court as to the SEMO defendants are affirmed.
 
 III.
 
 34
 We turn last to the two state officials involved in state proceedings brought against Dr. Kwoun as a result of the recommendation of the peer review groups. Defendant W.F. Montgomery is the deputy director for medical services of the Missouri Department of Social Services; defendant Gary Clark is the executive secretary of the Missouri State Board of Registration for the Healing Arts.
 
 
 35
 The Missouri Department of Social Services received a copy of the peer review group report that was submitted to HCFA. On the basis of that report, the Missouri Department of Social Services suspended Dr. Kwoun from eligibility for payments under the state Medicaid program. Defendant Montgomery was apparently the state officer who initiated the suspension.
 
 
 36
 The Missouri State Board of Registration for the Healing Arts--the state licensing body for doctors, see Mo.Ann.Stat. Sec. 334.120 (Vernon 1987), which has the power to suspend or revoke a doctor's license, see Mo.Ann.Stat. Sec. 334.100 (Vernon 1987)--also received a copy of the peer review group report that was submitted to HCFA. On the basis of that report, the Missouri State Board of Registration for the Healing Arts initiated proceedings to suspend or revoke Dr. Kwoun's license to practice medicine in Missouri. Defendant Clark, as the executive secretary of the board, was apparently the officer who initiated the proceedings for the board. He is considered an administrative officer (rather than a clerical employee). See Mo.Ann.Stat. Sec. 334.123 (Vernon 1987) and Mo.Ann.Stat. Sec. 620.010.15(4) (Vernon 1987).
 
 
 37
 Defendant Montgomery's suspension of Dr. Kwoun from eligibility for state Medicaid payments is clearly an act that was performed under the discretionary powers of his position; similarly, defendant Clark's act in initiating license suspension/revocation proceedings against Dr. Kwoun is clearly an act that was performed under the discretionary powers of his position. Each is therefore immune under Missouri law from the common-law tort claims asserted against him. Kanagawa v. State by and through Freeman, 685 S.W.2d 831, 835 (Mo.1985) (en banc).
 
 
 38
 The analysis of absolute immunity from constitutional claims for these state defendants is the same as that applicable to federal defendants. Butz v. Economou, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978). We therefore find that each is also immune from the constitutional claims asserted against him.
 
 
 39
 The process of deciding whether to impose a state Medicaid exclusion sanction, the process of deciding whether to initiate a license suspension/revocation proceeding, and the process of deciding whether to impose a federal Medicare exclusion sanction are all of a kind. Each is essentially an advocatory prosecutorial function--"deciding whether a proceeding should be brought and what sanctions should be sought," Butz, 438 U.S. at 515, 98 S.Ct. at 2915, against "a specific target," Gray v. Bell, 712 F.2d 490, 501 (D.C.Cir.1983), cert. denied, 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984). Indeed, the administrative and judicial review available under Missouri law is similar to that available under federal law. See Mo.Ann.Stat. Sec. 621.055.1 (Vernon 1987), Mo.Ann.Stat. Sec. 536.100 (Vernon 1953) (review of exclusion from state Medicaid program); Mo.Ann.Stat. Sec. 334.100.2 and Sec. 334.100.3 (Vernon 1987), Mo.Ann.Stat. Sec. 621.100, Sec. 621.110, and Sec. 621.145 (Vernon 1987), and Mo.Ann.Stat. Sec. 536.100 (Vernon 1953) (review of suspension/revocation of license to practice medicine); and 42 U.S.C. Sec. 1395y(d)(3) (review of exclusion from federal Medicare program).
 
 
 40
 The orders dismissing the state defendants, along with the orders dismissing the federal defendants and the SEMO defendants, are therefore affirmed.
 
 
 41
 HEANEY, Circuit Judge, dissenting.
 
 
 42
 I respectfully dissent. In my view, this Court should not blindly accord absolute immunity to all federal defendants for their alleged violations of Dr. Kwoun's constitutional rights and should not accord absolute immunity to any of the Southeast Missouri Professional Standards Review Organization (SEMO) defendants for their alleged violations of Dr. Kwoun's constitutional rights. I am otherwise in accord with the majority.
 
 The Federal Defendants:
 
 43
 Absolute immunity should not be extended to all of the federal defendants for their alleged constitutional violations at this time because the record does not establish that all of them are necessarily entitled to it. The majority correctly notes that entitlement to absolute immunity for constitutional violations is governed by Butz v. Economou, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), which holds that "agency officials performing certain functions analogous to those of a prosecutor" are entitled to absolute immunity. Id. at 515, 98 S.Ct. at 2915. What they neglected to point out is that the burden of establishing absolute immunity rests on those who claim it, see Harlow v. Fitzgerald, 457 U.S. 800, 812, 102 S.Ct. 2727, 2735, 73 L.Ed.2d 396 (1982); Butz, 438 U.S. at 506, 98 S.Ct. at 2910, and that the issue is one of fact to be decided in the first instance by the trial court. We should do as the Supreme Court of the United States did in Butz and remand the matter to the district court to determine which federal defendants, if any, were "responsible for the decision to initiate or continue a proceeding subject to agency adjudication" and to grant absolute immunity to those defendants and those only. Butz, 438 U.S. at 523, 98 S.Ct. at 2919, on remand, 466 F.Supp. 1351 (S.D.N.Y.1979) (finding that all but two of the defendants were entitled to absolute immunity).
 
 
 44
 This Court is in no position to determine which federal officials are entitled to absolute immunity on the record before it. The district court has already held that the federal defendants are entitled to qualified immunity only. Thus, we can hardly rely on the court's earlier decision to support a claim for absolute immunity. The district court should be given an opportunity to review the full record and make appropriate findings. Dr. Kwoun is entitled to have an opportunity to submit any additional evidence that may be relevant and to fully argue his position before the district court.
 
 
 45
 Lest it be argued that the district court's March 27, 1986, sua sponte order dismissing the complaint against all federal defendants is tantamount to granting absolute immunity, I would point out that the district court does not mention the federal defendants in that order. Moreover, the court discussed the federal defendants in its September 19, 1985, order and held that absolute immunity should not be extended to them under Butz. It is also important to note the district court specifically refused to dismiss Dr. Kwoun's claims under 42 U.S.C. Sec. 1981 and 42 U.S.C. Sec. 1985(3) stating the complaint clearly alleged Dr. Kwoun was denied participation in the Medicare program because of his race.[1] This is a clear allegation of a constitutional violation that can only be avoided if the district court finds it meritless or specifically finds that each federal defendant is entitled to absolute immunity.
 
 The SEMO Defendants:
 
 46
 Absolute immunity should not be extended to the SEMO defendants for a very simple reason. Congress specifically provided that participants in the review process were entitled to qualified immunity only. At the time the events in this case took place, 42 U.S.C. Sec. 1320c-6(b)(1), provided:
 
 
 47
 (b)(1) No individual who, as a member or employee of any Professional Standards Review Organization or of any Statewide Professional Standards Review Council or who furnishes professional counsel or services to such organization or council, shall be held by reason of the performance by him of any duty, function, or activity authorized or required of Professional Standards Review Organizations or of Statewide Professional Standards Review Councils under this part, to have violated any criminal law, or to be civilly liable under any law, of the United States or of any State (or political subdivision thereof) provided he has exercised due care.
 
 
 48
 (2) The provisions of paragraph (1) shall not apply with respect to any action taken by an individual if such individual, in taking such action, was motivated by malice toward any person affected by such action.
 
 
 49
 Id. (as amended October 25, 1977) (emphasis added).
 
 
 50
 The current statutory section, effective September 3, 1982, provides:
 
 
 51
 (b) Employees and fiduciaries of organizations having contracts with Secretary
 
 
 52
 No person who is employed by, or who has a fiduciary relationship with, any such organization or who furnishes professional services to such organization, shall be held by reason of the performance by him of any duty, function, or activity required or authorized pursuant to this part or to a valid contract entered into under this part, to have violated any criminal law, or to be civilly liable under any law of the United States or of any state (or political subdivision thereof) provided he has exercised due care.
 
 
 53
 42 U.S.C. Sec. 1320c-6(b) (emphasis added).
 
 
 54
 It is clear that under either provision, qualified, not absolute, immunity is the standard to be applied to the SEMO defendants. In a case with facts nearly identical to the instant case, a black doctor brought suit against a Professional Standards Review Organization (PSRO), its staff, a hospital, and hospital officials, alleging discrimination in determining that many of the medical services performed by the doctor for his Medicare and Medicaid patients were unnecessary. With regard to the immunity of the PSRO and its staff, the court stated: "Defendant concedes, and both statutory provisions specify, that PSRO defendants are not immune from liability if they act with malice." Taylor v. Flint Osteopathic Hosp., Inc., 561 F.Supp. 1152, 1160 (E.D.Mich.1983).[2] Thus, the statute is so clear that the Taylor defendants saw fit to concede and the court to expressly state that the PSRO and PSRO officials were entitled to qualified immunity only.
 
 
 55
 In this respect, the federal statute follows state statutes which have nearly uniformly codified the common law granting only qualified immunity to peer review committees.[3] The reason for qualified immunity is clear:
 
 
 56
 Peer review statutes, which state legislatures have enacted with increasing frequency in recent years, are directed towards the attainment of an elevated quality of health care at a reasonably low cost to the patient. Such legislation is based on the premise that the evaluation of the professional competency of doctors is best left to the specialized expertise of their peers, subject only to limited judicial surveillance. Peer review legislation promotes self-regulatory competence usually by protecting committee members with a qualified immunity and committee proceedings with some degree of confidentiality.
 
 
 57
 Franco v. District Court of Denver, 641 P.2d 922, 925 (Colo.1982) (citing, Note, The Legal Liability of Medical Peer Review Participants For Revocation of Hospital Staff Privileges, 28 Drake L.Rev. 692 (1978-79); Note, Medical Peer Review Protection In the Health Care Industry, 52 Temple L.Q. 552 (1979)).
 
 
 58
 Yet, it does not follow from the importance of and need for candor in peer review proceedings that peer review committees and those testifying before them should be accorded an absolute privilege to testify or render decisions in a racially discriminatory manner. Such conduct, as has been alleged in this case, advances no important interest of society or the professions and indeed actually hinders competent performance of the important tasks peer review committees are set up to perform. Thus, the conduct to which we may be affording an absolute privilege in this case and to which the majority's decision will most certainly afford an absolute privilege in future cases, has "no place in a forum convened to determine the qualifications of an individual to continue in the practice of his profession." Matviuw v. Johnson, 70 Ill.App.3d 481, 26 Ill.Dec. 794, 798, 388 N.E.2d 795, 799 (1979), aff'd, 111 Ill.App.3d 629, 67 Ill.Dec. 370, 444 N.E.2d 606 (1982).
 
 
 59
 To summarize, I would remand this matter to the district court to determine which of the federal defendants performed a function analogous to that of a prosecutor, arranged for the presentation of the government's case in the course of the administrative proceeding, or performed adjudicatory functions. Only those defendants should be extended absolute immunity for the alleged unconstitutional acts directed at Dr. Kwoun. I would further direct the district court to extend only qualified immunity to the SEMO defendants for their alleged unconstitutional acts. If Congress wishes to extend absolute immunity to those who participate in the peer-review process in prosecutorial or adjudicative functions, it is free to do so. Until it does, I believe we are bound by the statute as written.
 
 
 
 *
 The HONORABLE MORRIS S. ARNOLD, United States District Judge for the Western District of Arkansas, sitting by designation
 
 
 [1]
 The regional peer review group is known as the Southeast Missouri Professional Standards Review Organization (SEMO)
 
 
 [2]
 The other plaintiffs are corporate entities in which Dr. Kwoun has an interest
 
 
 [3]
 The statewide peer review group is known as the Missouri Statewide Professional Standards Review Council
 
 
 [4]
 The insurance company was dismissed on grounds other than those involved in these appeals; its dismissal was not appealed
 
 
 [5]
 The HCFA employees are collectively referred to by the parties as the federal defendants
 
 
 [6]
 The members of the regional and statewide peer review groups are collectively referred to by the parties as the SEMO defendants
 
 
 [7]
 A fourth HCFA employee was named as a defendant but did not appeal
 
 
 [8]
 Because HCFA failed to follow certain procedural requirements relating to notice to Dr. Kwoun in December, 1979, of the proposed exclusion, the federal defendants are also charged with denying Dr. Kwoun procedural due process. These allegations are apparently included only as a basis for the constitutional claims against them. In addition, the federal defendants are charged with various misconduct during the hearing before the administrative law judge. These charges are also apparently included only as a basis for the constitutional claims against them
 
 
 [9]
 The dissent would remand to the district court for a determination of which federal defendants' duties can be characterized as prosecutorial or adjudicative. Affidavits and exhibits already submitted by the federal defendants to the district court, however, establish that each one had the authority to "initiate or continue a proceeding subject to agency adjudication." Butz v. Economou, 438 U.S. 478, 516, 98 S.Ct. 2894, 2916, 57 L.Ed.2d 895 (1978)
 
 
 [10]
 "The decision to initiate administrative proceedings against an individual * * * is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution. An agency official, like a prosecutor, may have broad discretion in deciding whether a proceeding should be brought and what sanctions should be sought." Butz, 438 U.S. at 515, 98 S.Ct. at 2915. "[T]hose officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity * * * for their parts in that decision." Id. at 516, 98 S.Ct. at 2916
 
 
 [11]
 The complaint does not specify whether the individual SEMO defendants are sued in their individual or their official capacity. However, our conclusions about the nature of the exclusion sanctions process and the role of peer review groups within that process make that question irrelevant. In addition, it turns out that some of the individual SEMO defendants either were not associated with the peer review groups at the relevant times, did not participate in the investigation of Dr. Kwoun, or participated only as expert witnesses in the formal hearing before the administrative law judge. Our conclusions about the nature of the exclusion sanctions process and the role of peer review groups within that process make it unnecessary for us to make separate rulings as to the different classes of SEMO defendants
 
 
 [12]
 Once HHS acts on the recommendation of the peer review group, a formal hearing before an administrative law judge is available for review of the action taken by HHS, with eventual judicial review also available. See 42 U.S.C. Sec. 1395y(d)(3)
 
 
 [13]
 The dissent relies on a statutory provision, 42 U.S.C. Sec. 1320c-6(b), in arguing that the SEMO defendants are entitled only to qualified immunity. Legislative history on this provision, in either its current or previous incarnation, is sparse. The legislative history for the entire peer review statute currently in effect refers to the intent of Congress to exempt peer review reports from coverage under the Freedom of Information Act. See H.R.Conf.Rep. 760, 97th Cong., 2d Sess. 443, reprinted in 1982 U.S.Code Cong. and Admin.News 781, 1223. This exemption was probably a statement of agreement with the conclusions of the court in Public Citizen Health Research Group v. Department of Health, Education, and Welfare, 668 F.2d 537, 544 (D.C.Cir.1981), that, for FOIA purposes, peer review groups were not intended to be, do not qualify as, and should not be considered to be government agencies. However, it also supports the conclusion that Congress, unaware that the courts would find some consultants advising government agencies to be federal actors for immunity purposes (as opposed to FOIA purposes), originally considered the members of peer review groups to be private parties and sought to protect them to some extent from civil liability. In other words, the statute was an effort to extend some protection to people who were thought to have none, rather than an attempt to restrict protection already acknowledged to exist. See, e.g., S.Rep. 1431, 91st Cong., 2d Sess. 162 (1970) ("The amendment provides protection from civil liability for those engaged in required review activities * * * * ") (in reference to an early incarnation of the statute) (emphasis added). Once such consultants were considered federal actors for immunity purposes, of course, they became eligible for absolute immunity because of the prosecutorial or adjudicative function of their duties. The statutory provision is now superfluous for anyone except a consultant who would not be considered a federal actor for immunity purposes or one, classified as a federal actor for immunity purposes, whose duties would not be considered prosecutorial or adjudicative
 
 
 [14]
 Such a termination is not subject to judicial review. See 42 U.S.C. Sec. 1320c-2(f)
 
 
 [1]
 The record before us does not disclose whether the allegations of racial discrimination are purely conclusory in nature. SEMO's investigation initially focused on Poplar Bluff Hospital which reportedly had the highest readmission rate per 100 discharges of any hospital in its region. It was subsequently narrowed to four doctors, including Dr. Kwoun. As a result of the proceedings, however, neither the hospital nor the other three doctors were sanctioned. This action was reserved for Dr. Kwoun, apparently the only minority doctor in the hospital
 
 
 [2]
 Neither party saw fit to appeal any aspect of Judge Boyle's decision in Taylor. Subsequent to her decision, however, Judge Boyle was appointed to the Michigan state bench and the case was reassigned to Senior Judge George E. Woods. The PSRO and PSRO officials (defendants) again moved for summary judgment, arguing that the doctor's section 1981 claims, remaining after their initial summary judgment motions, should be dismissed because the doctor had failed to establish disparate treatment at the hands of the defendants. Judge Woods granted the defendants' summary judgment motion. On appeal, the Sixth Circuit, in an unpublished opinion, reversed and vacated only Judge Woods ruling and order, holding that, with respect to the section 1981 claim, issues of fact remained concerning the defendants' justifications for their actions. The Circuit Court thus remanded the case for trial on the merits. Taylor v. Flint Osteopathic Hosp., Inc., 765 F.2d 146 (6th Cir.1985). Thus, Judge Boyle's finding that the PSRO and its officials are entitled to qualified immunity remains in effect and, in the final analysis, Dr. Taylor will receive exactly what Dr. Kwoun should receive--a trial on the merits of his discrimination claim
 
 
 [3]
 See, e.g., Hayden v. Foryt, 407 So.2d 535, 536 (Miss.1982), (granting review committee and witnesses before committee qualified immunity); Franco v. District Court of Denver, 641 P.2d 922, 925 (Colo.1982) (granting review committee and committee members qualified immunity); Buckner v. Lower Florida Keys Hosp. Dist., 403 So.2d 1025, 1028 (Fla.App.1981) (granting hospital staff and disciplinary body and its agents qualified immunity); Hackethal v. Weissbein, 24 Cal.3d 55, 154 Cal.Rptr. 423, 426-27, 592 P.2d 1175 (1979) (granting qualified immunity to witnesses at hearing of peer review committee of nonpublic institution); Matviuw v. Johnson, 70 Ill.App.3d 481, 26 Ill.Dec. 794, 798, 388 N.E.2d 795, 799 (1979) (granting witnesses at hearing of peer review committee qualified immunity), aff'd, 111 Ill.App.3d 629, 67 Ill.Dec. 370, 444 N.E.2d 606 (1982); see also Southwick and Slee, Quality Assurance in Health Care, 5 J. Legal Med. 343, 386-96 (1984); D. Gregory, Immunity for Physicians in Peer-Review Committees, 11 Legal Aspects of Med. Practice No. 9, pp. 1, 2-4 (Sept.1983); J.C. Norman, So-Called Physician "Whistle-Blowers" Protected: Immunity of Peer-Review Committee Members from Suit, 11 Legal Aspects of Med. Practice No. 2, pp. 4-7 (Feb.1983)