**AGI–BLUFF MANOR, INC., et al., Plaintiffs,**

v.

**Michael V. REAGEN, Director, Missouri Department of Social Services, et al., Defendants.**

**No. 85–4015–CV–C–5.**

United States District Court, W.D. Missouri, C.D.

April 18, 1989.

---

**1538**

Rexford H. Caruthers, Peter W. Herzog, St. Louis, Mo., Joseph E. Casson, Washington, D.C., for plaintiffs.

William R. Rapps, Asst. General Counsel, Michael Boicourt, William Cornwell, Asst. Attys. Gen., Jefferson City, Mo., for defendants.

## ORDER

SCOTT O. WRIGHT, Chief Judge.

Pending before the Court is defendants' motion to dismiss. This motion and the responses thereto are very lengthy. In order to rule on these motions, the Court finds it expedient to follow the briefing method chosen by the defendants. Therefore, the Court shall proceed count by count, considering the claims against the defendants in their individual capacities first. A factual background shall be omitted from this order, because a factual background has previously been included in virtually every filing in this case; setting out the facts again would simply be redundant.

### Motion to Dismiss

In considering a motion to dismiss, the Eighth Circuit has held that the complaint should be liberally construed in the light most favorable to the plaintiff. *Fusco v. Xerox Corp.*, 676 F.2d 332, 334 (8th Cir. 1982). All inferences which may be drawn from the facts alleged should be drawn in favor of the plaintiff. *Parkview Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1212 n. 3 (8th Cir.1972). The complaint should not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts thereunder which would entitle him to relief. *Price v. Moody*, 677 F.2d 676, 677 (8th Cir.1982).

### Analysis

Counts Against Individual Defendants

I. *Count Three—Tortious Interference with Contract.*

In Count Three, the plaintiffs assert that defendants Reagen and Rapps, both officers of Department of Social Services (DOSS), tortiously induced breach of the settlement agreement by acting to promulgate the Emergency Amendment. The plaintiffs seek actual and punitive damages for this alleged tort from Reagen and

Rapps in their individual capacities. The defendants have moved to dismiss this count on the grounds that the plaintiffs have failed to state a claim for tortious inducement of breach of contract and because the defendants Reagen and Rapps are absolutely immune from this tort claim due to the immunity which arises out of the discretionary actions which they took within the scope of their official duties. Because the Court agrees that Reagen and Rapps are absolutely immune from this tort, this order shall not reach the issue of failure to state a claim for tortious inducement.

In Missouri, public officers are not liable for injuries arising from discretionary acts or omissions performed within the scope of their authority. *Kanagawa v. State by and through Freeman*, 685 S.W.2d 831, 835 (Mo.1985) (en banc). Public officers may be held liable only for torts committed when acting in a ministerial capacity. *Id.* A discretionary act is any act that requires the exercise of reason and judgment, and the determination of whether an act is discretionary does not entail an inquiry into the powers held by the officer. *Id.* at 836. A ministerial act, on the other hand, is one that is "of a clerical nature which a public officer is required to perform upon a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to his own judgment or opinion concerning the propriety of the act to be performed." *Rustici v. Weidemeyer*, 673 S.W.2d 762, 769 (Mo.1984) (en banc) (quoting *Yelton v. Becker*, 248 S.W.2d 86, 89 (Mo.Ct.App.1952)).

The definition of a discretionary act for immunity purposes must remain extremely broad in order to promote the important policy of "relieving public servants of the threat of burdensome litigations." *Kanagawa*, 685 S.W.2d at 836 (quoting *Sherrill v. Wilson*, 653 S.W.2d 661, 667 (Mo.1983) (en banc)). It is necessary for the conduct of effective government that public officers make their decisions and perform their duties free of liability and the threat of liability. *Jackson v. Wilson*, 581 S.W.2d 39, 42 (Mo.Ct.App.1979). For this reason, the Missouri doctrine of official immunity

provides an absolute immunity from suit, not just immunity from liability after trial. *State ex rel. Missouri Dept. of Agriculture v. McHenry*, 687 S.W.2d 178, 181 (Mo. 1985) (en banc).

The plaintiffs argue that defendants Reagen and Rapps are not entitled to absolute official immunity under Missouri law. They argue that the defendants' acts are ministerial acts. This argument is unfounded, however, because under Missouri law ministerial acts are clerical in nature, while the definition of discretionary acts is extremely broad. The plaintiffs' reliance on *Nika Corp. v. Kansas City*, 582 F.Supp. 343 (W.D.Mo.1983), is misplaced. In that case the court held that compliance with the terms of a contract regarding the return of certain materials to plaintiff imposed a ministerial duty on a city official who refused to return the materials. *Id.* at 356. By contrast, the complaint in this case alleges a policy decision to repudiate the settlement agreement rather than a simple failure to perform some mechanical aspect of it.

■ Defendants Reagen and Rapps are entitled to absolute official immunity for liability arising from their roles in promulgating the Emergency Amendment. Their actions with respect to the development of the Amendment were discretionary. They clearly exercised reason and judgment in deciding as administrators and legal counsel in an unprecedented situation to undertake an Amendment to the state plan. They determined that the Amendment was an appropriate solution to the problems created by the Health Care Financing Administration's (HCFA) deferral and imminent disallowance of the rates that were being paid to the plaintiff nursing homes. This decision by Reagen and Rapps was obviously made within the scope of their authority as administrators of the Medicaid program.

■ The plaintiffs further argue that even if the acts of Reagen and Rapps were discretionary, they are not entitled to official immunity because official immunity does not apply to discretionary acts done in

bad faith or with malice. *State ex rel. Twiehaus v. Adolph*, 706 S.W.2d 443, 446 (Mo.1986) (en banc). The plaintiffs' statements made in their complaint which assert that defendants Reagen and Rapps acted "willfully, wantonly and maliciously" do not affect the defendants' entitlement to immunity. In general, the motivations behind official acts are not relevant to whether the official is entitled to immunity under common law so long as the official was acting within his authority. *See Barr v. Matteo*, 360 U.S. 564, 569–74, 79 S.Ct. 1335, 1338–41, 3 L.Ed.2d 1434 (1959). It is true that Missouri has recognized an exception to official immunity for the discretionary acts of public officials who are "guilty of willful wrong in relation thereto." *State ex rel. Funk v. Turner*, 328 Mo. 604, 42 S.W.2d 594, 598 (1931) (quoted in *Jackson v. Wilson*, 581 S.W.2d 39, 42–43 (Mo.Ct. App.1979)). But this exception requires a showing of "actual intent to cause injury." *State ex rel. Twiehaus*, 706 S.W.2d at 447. If the allegations in a complaint fail to state facts from which it could reasonably be inferred that the official acted with such malice, the complaint will be dismissed. As the Supreme Court has held with respect to the federal law of official immunity, "bare allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery." *Harlow v. Fitzgerald*, 457 U.S. 800, 817–18, 102 S.Ct. 2727, 2737–38, 73 L.Ed.2d 396 (1982). Similarly, the Eighth Circuit has recently refused to sustain a claim requiring malice where the plaintiff made only conclusory allegations, as the plaintiffs have done here. *Reese v. Kennedy*, 865 F.2d 186, 188 (8th Cir.1989).

In contrast to the purely conclusory allegations of malice, the plaintiffs concede that the Emergency Amendment was adopted to insure the continuation of federal participation in the Medicaid rates paid to plaintiffs. Indeed, as this Court has already found, the Emergency Amendment was filed to preserve as much of the previously established rate as would be accepted by the federal government. (Order of October 27, 1988, at 5, denying motion for preliminary injunction). This is not a purpose from which malice can be inferred. Therefore, there is no support for the plaintiffs' conclusory allegations that defendants Reagen and Rapps acted maliciously toward the plaintiffs. Thus, in Count Three, the plaintiffs have failed to adequately plead the malice required to defeat the defendants' immunity defense. Therefore, Count Three shall be dismissed with prejudice.

## II. *Count Six—Taking*

In Count Six, the plaintiffs claim that the actions of defendants Reagen and Rapps in causing the promulgation of the Emergency Amendment effected a taking of the plaintiffs' property interest in the alleged settlement agreement without just compensation in violation of the Fifth and Fourteenth Amendments. The plaintiffs bring this Constitutional claim under § 1983, seeking money damages from the defendants Reagen and Rapps in their individual capacities.

Count Six shall be dismissed with prejudice on the ground that it fails to state a claim for unconstitutional taking. First, the Emergency Amendment did not effect the taking of any property interest the plaintiffs may have had in the alleged contract with DOSS. The amendment was a valid exercise of the state's police power to regulate health care benefits and did not have a substantial economic impact on the plaintiffs or significantly interfere with any reasonable investment-backed expectations. Second, the plaintiffs have no § 1983 cause of action for the alleged taking because Missouri law provides a completely adequate forum in which the plaintiffs may recover the value of any property taken. Furthermore, the plaintiffs' § 1983 claim for money damages from Reagen and Rapps must be dismissed because these defendants are entitled to qualified official immunity.

A. The Emergency Amendment did not affect the taking of plaintiffs' property.

■ In the present case, the defendants' promulgation of the Emergency Amend-

ment did not constitute an acquisition of title or physical occupancy of any tangible property owned by the plaintiffs. Instead, the Amendment is a state regulation that affects plaintiffs' property interests indirectly, if at all. The Supreme Court has held that such regulation will amount to a taking for purposes of the Fifth Amendment only "if its effects are so complete as to deprive the owner of all or most of his interest in the subject matter." *United States v. General Motors Corp.*, 323 U.S. 373, 378, 65 S.Ct. 357, 359, 89 L.Ed. 311 (1945). The Court has identified three factors that should be analyzed in determining when governmental regulation effects a taking. These factors are "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1005, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) (quoting *PruneYard Shopping Center v. Robins*, 447 U.S. 74, 83, 100 S.Ct. 2035, 2042, 64 L.Ed.2d 741 (1980)). An analysis of these factors in the present case demonstrates that the defendants' promulgation of the Emergency Amendment was not a taking of the plaintiffs' property interest in the settlement agreement.

First, the Emergency Amendment was promulgated by DOSS acting under the state's police power. DOSS is the state agency authorized by the Missouri General Assembly to regulate the distribution of Medicaid funds for the general health and welfare of the state's citizens. *See* Mo. Rev.Stat. § 208.159. Regulation of Medicaid reimbursement rates is an important exercise of a state's police power. *See Minnesota Ass'n. of Health Care Facilities v. Minnesota Dept. of Public Welfare*, 742 F.2d 442, 449–50 (8th Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985). Moreover, the Amendment was designed to remedy a problem of genuine concern affecting viability of the Missouri Medicaid system—the payment of funds to a sizeable number of health care providers for which HCFA was withholding federal participation.

Plaintiffs cannot show an economic impact sufficiently substantial to characterize the Emergency Amendment as an unconstitutional taking. Although the Emergency Amendment reduced the plaintiffs' rates, the Amendment preserved, to the extent allowed by HCFA, the rates plaintiffs were receiving under the alleged settlement agreement. The Amendment allowed the plaintiffs "to avail themselves of any past rate increase to which they might otherwise have been entitled but had foregone because they were already receiving the highest rates permitted within their class," and the new rates established under the Amendment gave plaintiffs "the full benefit of the annual trend factors applied to other facilities' rates up to September 1, 1987." (Court's Order at 5). This rate reduction clearly does not amount to an unconstitutional taking, which must be "so complete as to deprive the owner of all or most or his interest in the subject matter." *United States v. General Motors*, 323 U.S. at 378, 65 S.Ct. at 359.

Finally, there is no interference with the reasonable investment-backed expectations in this case. Plaintiffs simply allege that they are successors in interest to a contract with DOSS regarding Medicaid reimbursement rates and that this contract made Beverly's acquisition of the AGI facilities more attractive. Given the extent to which Medicaid reimbursement is heavily regulated by both federal and state statutes, the plaintiffs could not have had a reasonable expectation that their rates would not be reduced if HCFA objected to them. An investment-backed expectation recognized by the Supreme Court "must be more than a 'unilateral expectation.'" *Id.* 467 U.S. at 1005, 104 S.Ct. at 2874 (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161, 101 S.Ct. 446, 451, 66 L.Ed.2d 358 (1980)). Beverly's expectation regarding continued favorable reimbursement rates, which, in part, allegedly motivated its acquisition of the plaintiff nursing homes, was entirely unilateral. Beverly was simply taking a business risk when it entered into the contract with AGI.

**B. Missouri law adequately protects plaintiffs' right to seek just compensation.**

There has been no violation of plaintiffs' constitutional rights because they have an adequate opportunity to seek compensation for the alleged taking. The just compensation clause of the Fifth Amendment does not prohibit the sovereign from taking private property. It merely creates in the owner of the property a right to "just compensation" if there is a taking. *Nika Corp. v. City of Kansas City*, 582 F.Supp. 343, 362 (W.D.Mo.1984). "The clause contains no specific requirements with respect to when, how, or by what procedures 'just compensation' is to be determined and paid." *Id.* Thus, the owner whose property has been taken need not be compensated in advance or at the time of the taking, as long as he may obtain compensation with reasonable legal certainty and without unreasonable delay. *Id.* at 363 (citations omitted).

The compensation requirement will be satisfied if "the property owner has a meaningful ability under state law to sue and collect a judgment from the taking entity." *Id.* Where state law provides an adequate remedy by way of suit, there is no denial or infringement of rights under the just compensation clause and, therefore, no claim can be brought under § 1983. *Collier v. City of Springdale*, 733 F.2d 1311, 1317 (8th Cir.), *cert. denied*, 469 U.S. 857, 105 S.Ct. 186, 83 L.Ed.2d 120 (1984).

In the present case, the property interest that the plaintiffs claim has been taken for public use by DOSS is a contract interest. The plaintiffs' interest in that alleged contract is fully and adequately protected by their ability under Missouri law to bring an action against DOSS for breach of contract. Therefore, it is plain that the plaintiffs cannot have a cause of action under § 1983 for an unconstitutional taking. For these reasons, Count Six shall be dismissed with prejudice for failure to state a constitutional claim.

**C. The Defendants are entitled to qualified immunity.**

State executive officials who perform discretionary functions are entitled to qualified immunity from § 1983 suits. *Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). This immunity is no different from that afforded executive officials of the federal government who are sued for constitutional violations. *Butz v. Economou*, 438 U.S. 478, 504, 98 S.Ct. 2894, 2909, 57 L.Ed.2d 895 (1978). The officials are "shielded from liability" where the alleged conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed. 2d 396 (1982). A plaintiff cannot avoid this defense by alleging that the defendants violated a generalized, albeit clearly established, principle of law, such as due process. *Anderson v. Creighton*, 483 U.S. 635, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987). "The right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense; the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.*

The standard for application of the qualified immunity doctrine is wholly objective and does not entail an inquiry into the official's state of mind. *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738. The determination of whether individual defendants are entitled to immunity from suit under § 1983 is a "purely legal question." *Boswell v. County of Sherburne*, 849 F.2d 1117, 1120 (8th Cir.1988). This question turns on whether "the legal norms allegedly violated by the defendant were clearly established at the time of the challenged actions." *Mitchell v. Forsythe*, 472 U.S. 511, 528, 105 S.Ct. 2806, 2816, 86 L.Ed.2d 411 (1985). Thus, the Court may appropriately address qualified immunity on a motion to dismiss for failure to state a claim. *Id.* at 526, 105 S.Ct. at 2815.

As with Missouri's doctrine of absolute immunity from common law tort claims,

the policy behind the federal doctrine of qualified immunity from constitutional and statutory claims is to protect public officials not only from monetary liability but also from the burdens of discovery and the disruption of going to trial at all. *Birkenholz v. Sluyter,* 857 F.2d 1214, 1215 (8th Cir.1988). Qualified immunity is "an immunity from suit rather than a mere defense to liability, and ... it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell,* 472 U.S. at 526, 105 S.Ct. at 2815 (emphasis in original).

■ The individual defendants in the present case are entitled to immunity from the plaintiffs' § 1983 claims unless the unlawfulness of their alleged actions must have been apparent in light of clearly established, pre-existing legal norms. *Anderson v. Creighton,* 107 S.Ct. at 3039. Immunity applies if a reasonable official acting in defendants' position could have believed that his actions were not violating the plaintiffs' federal statutory or constitutional rights. *Id.*

Count Six alleges that promulgation of the Emergency Amendment constituted a taking of the plaintiffs' property interest in the alleged settlement agreement rates without just compensation in violation of the Fifth and Fourteenth Amendments. As a preliminary matter, it is not clearly established that health care providers can ever have a property interest in prospective Medicaid reimbursement rates. Most courts have held that providers can have no property interests in Medicaid rates. *See, e.g., Oberlander v. Perales,* 740 F.2d 116, 120 (2nd Cir.1984); *Grossman v. Axelrod,* 646 F.2d 768, 771 (2d Cir.1981); *Al–Charles, Inc. v. Heintz,* 620 F.Supp. 327, 331 (D.Conn.1985); *Arden House, Inc. v. Heintz,* 612 F.Supp. 81, 84 (D.Conn.1985); *St. Joseph Hospital v. Electronic Data Systems,* 573 F.Supp. 443, 447 (S.D.Tex. 1983). A few courts have implied, without specifically finding, the existence of such property interests. *See, e.g., Massachusetts General Hospital v. Weiner,* 569 F.2d 1156, 1160 (1st Cir.1978). This division of authority at a minimum proves the absence of a clearly established legal norm under

*Harlow v. Fitzgerald. See Mitchell,* 472 U.S. at 533–35, 105 S.Ct. at 2819–20 (no clearly established right where decisions of lower federal courts reflect uncertainty).

Even if the plaintiffs held a property interest in receiving certain rates secured by the alleged settlement agreement, it would have been reasonable for defendants to believe that the Emergency Amendment did not operate as a taking of this property interest. As demonstrated above, it is well-established that a regulatory act under the state's police power to provide for the health and public welfare of its citizens will not amount to a taking unless it deprives the owner of "all or most of his interest in the subject matter." *United States v. General Motors Corp.,* 323 U.S. at 378, 65 S.Ct. at 359. The Emergency Amendment clearly did not go that far; it merely adjusted the plaintiffs' rates "to preserve as much of the previously established rates as would be accepted by the federal government." (Court's Order at 5.) Consequently, defendants could have reasonably believed that their adjustment of the plaintiffs' reimbursement rates to satisfy HCFA did not amount to an unconstitutional taking of private property for public use.

Moreover, even if the Amendment did constitute a taking, defendants could have reasonably believed that plaintiffs' rights to just compensation were adequately protected under Missouri law by an action for breach of contract or inverse condemnation. Since law is clear that there is no constitutional violation where an adequate state forum exists for obtaining just compensation, defendants did not violate any clearly established law.

In light of the above analysis, it is clear that Count Six must be dismissed with prejudice.

### III. *Count Seven—Substantive Due Process*

In Count Seven plaintiffs seek damages from Reagen and Rapps under § 1983 on the ground that they violated plaintiffs' substantive due process rights by using the powers of the state to harrass plaintiffs. This harrassment is alleged to consist of:

(1) issuing the Emergency Amendment; (2) requiring plaintiffs to relitigate the rights allegedly secured by the settlement agreement; (3) making frivolous motions in administrative hearings; (4) initiating unrelated investigations; and (5) taking positions allegedly contrary to representations made to the federal government. In this Count, plaintiffs are not challenging the validity of the Emergency Amendment or the procedural safeguards provided by the state. They are claiming that the actions of the defendant state officials exceeded the bounds of fundamental fairness.

While procedural due process requires that a state provide a procedural remedy when it deprives a person of life, liberty or property, substantive due process imposes limits on what a state may do regardless of what process is provided. *Porter v. City of Detroit*, 639 F.Supp. 589, 593 (E.D.Mich. 1986). A substantive due process claim does not require that a specific constitutional guarantee be violated; but it does require that the actions alleged be such as to "shock the conscience," offend the "concept of ordered liberty," or suggest "outrageousness." *Baker v. McCollan*, 443 U.S. 137, 147, 99 S.Ct. 2689, 2696, 61 L.Ed. 2d 433 (1979) (Blackmun, J., concurring). Unless the alleged conduct is so egregious as to violate "a principle of justice so rooted in the conditions and conscience of our people as to be ranked as fundamental," *Snyder v. Massachusetts*, 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), it does not violate substantive due process and will not support a claim cognizable under § 1983. *See Baker v. McCollan*, 443 U.S. at 146–47, 99 S.Ct. at 2695–96.

The plaintiffs cite three cases which they contend demonstrate that harrassing litigation tactics constitute violations of substantive due process. *Continental Can Co., U.S.A. v. Marshall*, 603 F.2d 590 (7th Cir. 1979); *United States v. Ashland–Warren, Inc.*, 537 F.Supp. 433 (M.D.Tenn.1982); *United States v. American Honda Motor Co.*, 273 F.Supp. 810 (N.D.Ill.1967). None of these cases, however, was a § 1983 action for damages. Instead, each of them involved claims of substantive due process

as a defense to criminal or administrative enforcement actions.

■ In this case, the plaintiffs have alleged nothing more than the state law tort of malicious prosecution or abuse of process. An intentional tort "does not become a violation of the Fourteenth Amendment merely because the defendant is a state official." *Baker v. McCollan*, 443 U.S. at 146, 99 S.Ct. at 2696. Where a plaintiff has merely made out a claim for malicious prosecution or abuse of process, no § 1983 action will be allowed because state remedies are available for redress of these common torts. *See, e.g., Coogan v. City of Wixom*, 820 F.2d 170, 174–75 (6th Cir.1987) (even if plaintiff were able to establish all elements of malicious prosecution, proper avenue of relief was state court action other than claim under § 1983).

■ Even if it were assumed that plaintiffs had stated a claim for harrassment under § 1983, it is clear that defendants Reagen and Rapps are entitled to absolute immunity from plaintiffs' claims in Count Seven. The plaintiffs allege that Reagen and Rapps have caused rule-making proceedings, enforcement proceedings and civil lawsuits to be instituted against the plaintiffs, and that Reagen and Rapps have acted in various improper ways in administrative proceedings. These alleged actions are shielded by absolute immunity under the Supreme Court's opinions in *Butz v. Economou*, 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), and *Imbler v. Pachtman*, 424 U.S. 409, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976).

In *Imbler*, the Court held that a state prosecutor was absolutely immune from § 1983 claims with respect to his activities as an advocate in criminal litigation. *Id.* at 430, 96 S.Ct. at 995. Among the specific activities held to be exempt were decisions to initiate cases. *Id.* at 431, 96 S.Ct. at 996. This immunity was based on the same considerations that support common law absolute immunity for other participants in the judicial process, such as judges, witnesses, and jurors. *Id.* at 422–24, 96 S.Ct. at 991–92. This immunity applies whether the judicial process is criminal or civil. *Stump v.*

*Sparkman,* 435 U.S. 349, 355–56, 98 S.Ct. 1099, 1104–05, 55 L.Ed.2d 331 (1978). Thus, state officials are absolutely immune from claims for damages arising from their actions in initiating, conducting or defending civil litigation, since absolute immunity turns not on the nature of the proceeding, but on whether the officials' function is analogous to that of a prosecutor or advocate. *Meade v. Grubbs,* 841 F.2d 1512, 1532–33 n. 18 (10th Cir.1988); *Barrett v. United States,* 798 F.2d 565, 572 (2d Cir. 1986). As the Court explained in *Butz,* "absolute immunity is … necessary to assure that judges, advocates, and witnesses can perform their respective functions without harrassment or intimidation." 438 U.S. at 512, 98 S.Ct. at 2913. Accordingly, insofar as Reagen and Rapps are alleged to have wrongfully initiated civil litigation, they are absolutely immune.

*Butz* applied the absolute immunity available to judges, advocates, and witnesses in judicial litigation to participants in administrative proceedings. *Butz,* 438 U.S. at 512–13, 98 S.Ct. at 2913–14. Of particular relevance to the claims pressed against Reagen and Rapps, the Court observed that "the decision to initiate administrative proceedings against an individual or corporation is very much like the prosecutor's decision to initiate or move forward with a criminal prosecution." *Id.* at 515, 98 S.Ct. at 2915. Such officials must be able to make those decisions "free from intimidation or harrassment." *Id* at 516, 98 S.Ct. at 2916. "Because the legal remedies already available to the defendant in such a proceeding provide sufficient checks on agency's zeal, we hold that those officials who are responsible for the decision or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision." *Id.* This holding is decisive on the plaintiffs' claims against Reagen and Rapps in Count Seven. Indeed, the Court of Appeals has held that DOSS officials are entitled to absolute immunity under *Butz* for their roles in enforcement actions connected with the Medicaid program. *Kwoun v. Southeast Missouri Professional Standards Review Organization,* 811 F.2d 401, 410 (8th Cir.1987).[1] In light of the above analysis, it is clear that the defendants Reagen and Rapps are entitled to absolute immunity in this case. Therefore, Count Seven shall be dismissed with prejudice.

## IV. *Count Eight—Procedural Due Process*

In Count Eight, plaintiffs claim that promulgation of the Emergency Amendment deprived them of their property interest in the alleged settlement agreement without due process of law in violation of the Fourteenth Amendment. They claim that due process required defendants to afford them an opportunity for a hearing prior to promulgating the Emergency Amendment.

■ Plaintiffs are entitled to procedural due process only if the promulgation of the Emergency Amendment adversely affected a constitutionally cognizable interest. Here, plaintiffs allege that the rights under the purported settlement agreement are property rights protected by the Fifth and Fourteenth Amendments. The asserted rights under the alleged settlement agreement are rights to certain reimbursement rates. However, health care providers do not have a cognizable property interest in reimbursement rates under Title XIX. *See Oberlander v. Perales,* 740 F.2d 116, 120 (2d Cir.1981); *St. Joseph Hospital v. Electronic Data Systems,* 573 F.Supp. 443, 447 (S.D.Tex.1983). Thus, the promulgation of the Emergency Amendment and the alleged breach of contract did not affect any property right for which procedural process might be required.

---

1. Although *Butz* was concerned with federal administrative proceedings, the reasoning is equally applicable to the state administrative proceedings involved here because those state proceedings are just as much like judicial proceedings as are federal administrative proceedings. To challenge the Emergency Amendment, plaintiffs have recourse to the Administrative Hearing Commission and, if dissatisfied there, to judicial review in the state courts. *Kwoun,* 811 F.2d at 410.

█ Even assuming that plaintiffs have a property interest in the alleged settlement agreement which merits due process, plaintiffs cannot claim a due process violation in DOSS's failure to afford a hearing prior to enactment of the Emergency Amendment. The two requirements of due process are notice and an opportunity to be heard, *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950), and both elements have been satisfied in the present case.

Plaintiffs received adequate notice of the alleged deprivation of their property interest. Public notice of the proposed Emergency Amendment was published in the Missouri Register, 12 Mo.Reg. 1299 (1987). Further, plaintiffs were notified by letter from DOSS of the new rates established under the Amendment. Such notice is fully adequate for due process purposes and the context of a state's recoupment of past Medicaid payments. *See Oberlander*, 740 F.2d at 120. It follows that such notice is also fully adequate in the case of a prospective rate adjustment.

It is equally clear that the state procedures available to plaintiffs afforded them a meaningful opportunity to be heard. Under well-established Supreme Court doctrine, plaintiffs' due process right to a meaningful hearing was fully protected by post-deprivation remedial procedures available under state law. *Parratt v. Taylor*, 451 U.S. 527, 543–44, 101 S.Ct. 1908, 1916–17, 68 L.Ed.2d 420 (1981). The availability of adequate avenues of review under state law will foreclose a § 1983 claim for violation of procedural due process rights. *Birkenholz v. Sluyter*, 857 F.2d 1214, 1217 n. 5 (8th Cir.1988) (quoting *Marino v. Ameruso*, 837 F.2d 45, 47 (2d Cir.1988)). Plaintiffs were able to seek a hearing on the validity of the rate revisions imposed under the Emergency Amendment. *Mo.Rev.Stat.* §§ 208.156, 621.055. Indeed, as alleged in the complaint, they initiated such an administrative appeal in October, 1987 to review the new rates. In addition, Missouri allows plaintiffs to appeal this administrative rate review decision to state court. *Mo.Rev. Stat.* § 621.145. Finally, since the alleged settlement agreement is the only conceivable source of property interest to which plaintiffs can point, their interests are adequately and fully protected by the ability to seek redress for simple breach of contract in state court.

█ These state procedural remedies provide plaintiffs extensive post-deprivation review which fully satisfies their due process right to a hearing. *See, e.g., Oberlander*, 740 F.2d at 120–21. Plaintiffs were not entitled to a hearing prior to the promulgation of the Emergency Amendment. Due process simply requires "some kind of hearing ... 'at a meaningful time and in a meaningful manner.'" *Parratt v. Taylor*, 451 U.S. 527, 540, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). Under the Supreme Court's analysis in *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976), a hearing is required prior to a state imposed deprivation only when the private interest affected weighs heavily in relation to the interest of the government and where the procedures followed do not adequately safeguard against an erroneous deprivation. The Court has required a prior hearing only in very few, extreme cases. *See Parratt*, 451 U.S. at 540 n. 5, 101 S.Ct. at 1915 n. 5; *Oberlander*, 740 F.2d at 121. These cases typically involve an individual plaintiff who is the intended beneficiary of an entitlement program and the termination of government benefits that represent a crucial source of income to the plaintiff. *See, e.g., Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

A change in the level of Medicaid reimbursement to health care providers does not present a sufficient private interest to require a pre-deprivation hearing. *Oberlander*, 740 F.2d at 121. The $2 billion a year Beverly Corporation plainly is not in the same position as the welfare recipient in *Goldberg v. Kelly*. Further, the state's interest in retaining the flexibility in a program as complex as Medicaid to adjust provider's rates without first giving each individual provider an opportunity for a

hearing is substantial. *Oberlander*, 740 F.2d at 121. Plaintiff's interest, on the other hand, is merely contractual. It is not the sort of personal, individualized interest that calls for heightened protections such as the continued receipt of safety net benefits that was at issue in *Goldberg v. Kelly*. *See Oberlander*, 740 F.2d at 121. Finally, plaintiffs have made no allegation that failure to provide a hearing prior to amending the state plan for the purpose of readjusting payment rates creates a serious risk that the revised rates will be erroneously calculated, or that such a risk could not be adequately remedied by prompt, post-deprivation review. *Id.* Thus, plaintiffs have no claim for a procedural due process violation.

Plaintiffs assert that the availability of post-deprivation procedures is irrelevant in this case because a pre-deprivation hearing was not impractical. Plaintiffs overlook the fact that the Emergency Amendment was issued pursuant to a statutory procedure that provides for emergency rule-making without the usual opportunity for notice and comment. *Mo.Rev.Stat.* § 536.025 (1987). Plaintiffs have not challenged the constitutionality of that statute, but only defendants' use of the statute in this case. The Eighth Circuit cases applying *Parratt* clearly hold that in the absence of such a challenge to the statute which authorizes summary proceedings, courts must examine the availability of post-deprivation remedies to determine whether the absence of a pre-deprivation hearing constitutes a violation of due process. *Reese v. Kennedy*, 865 F.2d at 187; *Birkenholz*, 857 F.2d at 1217. Furthermore, plaintiffs' allegation that defendants Reagen and Rapps have acted unconstitutionally in the course of the post-deprivation proceedings does not vitiate the constitutional adequacy of the proceedings themselves, which plaintiffs have not challenged in their complaint.

The availability of post-deprivation remedies also makes it clear that defendants are entitled to qualified immunity on plaintiffs' procedural due process claim, as *Birkenholz*, 857 F.2d at 1218, clearly holds. The plaintiff in that case was the director

of nursing at a private mental health facility. Officials of the Missouri Department of Mental Health summarily found her guilty of neglect of patients, a finding which required her employer to fire her. The court ruled that two Missouri statutes, both of which are available to plaintiffs in the instant case, provided Birkenholz with an opportunity for post-deprivation review of the finding adverse to her. Accordingly, the court held that defendants were entitled to qualified immunity because a reasonable official in defendants' position would have concluded, in light of the availability of these post-deprivation remedies, that denial of a pre-deprivation hearing did not violate plaintiffs' procedural due process rights. "Given the adequacy of Birkenholz's remedies under state law, any due process violation by defendants could not have been apparent. Because any violation could not have been apparent, Birkenholz's due process right was not 'clearly established' for qualified immunity purposes." 857 F.2d at 1218. This holding plainly dictates the same conclusion in this case. Therefore, the plaintiffs' claim for violation of procedural due process rights shall be denied and Count Eight shall be dismissed with prejudice.

## V. Count Nine—RICO

In Count Nine, plaintiffs claim that defendants Reagen, Moody, Miller, McClure and Rapps, in their individual capacities, have violated the civil provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"), by conducting an interstate enterprise through a pattern of racketeering activity. Plaintiffs allege that these defendants, together with other unnamed state officials, formed an association in fact to conduct "two separate schemes of unlawfully depriving plaintiffs of the Medicaid rates to which they are legally entitled under the AGI settlement and the Medicaid Act and of attempting to defraud the federal government of its share of the State's recoupment of alleged Medicaid overpayments, all in violation of 18 U.S.C. § 1962(c)." Plaintiffs further allege that the defendants conducted the affairs of

this enterprise through a pattern of racketeering activity, namely violations of the Federal Mail Fraud Statute, 18 U.S.C. § 1341.

The alleged acts of mail fraud in the scheme against plaintiffs are the mailing to HCFA in June, 1987, of a copy of the proposed Emergency Amendment, and the mailing of letters in September, 1987 to the 22 plaintiff nursing homes informing them of their rate adjustments under the Emergency Amendment. Plaintiffs also allege that three letters sent by defendants to HCFA and OIG defending the rates paid under the alleged settlement agreement, which HCFA and OIG had challenged, were "inconsistent" with promulgation of the Emergency Amendment and were somehow in furtherance of the alleged scheme to deprive the plaintiffs of these higher rates.

Defendants allege that the purported scheme to defraud the federal government of its share of "Medicaid overpayments" was activated in December, 1986, when unnamed state officials transferred the funds received by Missouri Research Institute (MRI) pursuant to the settlement agreement to the Missouri General Revenue Fund. In furtherance of this scheme, plaintiffs allege, upon information and belief, that defendants mailed fraudulent tax returns and accounting statements concerning MRI to IRS, HCFA and HHS. Plaintiffs also allege that a letter from Moody, the acting director of DOSS, to HCFA arguing that the settlement agreement rates were valid and proper was in furtherance of this scheme.

Plaintiffs allege that they have been and continue to be harmed in their business and property as a result of defendants' conduct. They request the Court to enter judgment in their favor on their RICO claims and grant them treble their actual damages plus costs and attorneys' fees.

After analysis of the law and the facts on this count, it is the Court's conclusion that Count Nine must be dismissed for failure to state a claim upon which relief can be granted. A violation of 18 U.S.C. § 1962(c), the section on which plaintiffs

rely, requires proof of (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). The complaint does not adequately allege any of the elements of a RICO claim. First, plaintiffs have not adequately alleged that defendants engaged in any predicate acts of racketeering activity. Second, plaintiffs have failed to allege that defendants are engaged in racketeering activities which are sufficiently related and continuous to establish the necessary pattern requirement. Third, the complaint does not sufficiently allege the existence of an enterprise to meet RICO pleading requirements.

A violation of any of the four sections of 18 U.S.C. § 1962 requires that the defendant engaged in a "pattern of racketeering activity." A pattern of racketeering activity requires the commission of "at least two acts of racketeering activity." 18 U.S.C. § 1961(5). "Racketeering activity" is defined, *inter alia*, as any act which is indictable under certain specified sections of the criminal code, including 18 U.S.C. § 1341 (mail fraud). 18 U.S.C. § 1961(1). The "predicate acts" alleged by plaintiffs as the basis for their RICO claim are all violations of the Mail Fraud Statute.

The central defect in plaintiffs' RICO claim is that plaintiffs have not adequately alleged the essential elements of acts of mail fraud. Furthermore, the allegations of the complaint do not comply with Fed.R. Civ.P. 9(b) which requires that "in all averments of fraud ... the circumstances constituting fraud ... shall be stated with particularity." Fed.R.Civ.P. 9(b). Rule 9(b) applies to RICO complaints, and requires specificity in pleading when fraud is the claimed predicate offense. *Flowers v. Continental Grain Co.*, 775 F.2d 1051, 1054 (8th Cir.1985).

The elements of mail fraud are "(1) a scheme to defraud, and (2) the mailing of a letter, etc. for the purpose of executing the scheme." *Pereira v. United States*, 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). *See also DeMier v. United States*, 616 F.2d 366 (8th Cir.1980). In order to

allege a scheme to defraud for purposes of § 1341, plaintiffs must allege that defendants sought to obtain money or other property by means of false or fraudulent pretenses, promises or representations. *Pritchard v. United States*, 386 F.2d 760, 764 (8th Cir.1967), *cert. denied*, 390 U.S. 1004, 88 S.Ct. 1247, 20 L.Ed.2d 104 (1968). "A scheme to defraud must seek to deprive the [target of the fraud] of … services or funds through fraudulent or deceptive means, such as material misrepresentation, concealment, the breach of a duty to disclose information, or the taking of bribes or kickbacks." *United States v. Pintar*, 630 F.2d 1270, 1280 (8th Cir.1980).

With respect to the alleged scheme against Beverly, plaintiffs have not alleged any specific instances of misrepresentations or untruthfulness on the part of the defendants toward plaintiffs. Defendants made no attempt to mislead the plaintiffs with regard to the rates which they were paying. As alleged in the complaint, defendants published the Emergency Amendment in the Missouri Register and thereafter, defendants notified plaintiffs by letter of the rates which they would pay under the Emergency Amendment and the reasons for setting those rates. Nor were there any misrepresentations contained in defendants' correspondence with HCFA. Although defendants argued to HCFA that, as a matter of law, the rates paid under the alleged settlement agreement were proper, those assertions of law certainly did not amount to misrepresentations of fact, which are a necessary element of any fraudulent communication.

The plaintiffs allege on "information and belief" that defendants caused the mailing of false tax returns and accounting statements. Allegations of fraud "on information and belief," however, do not meet the requirements of Rule 9(b). *In re Falstaff Brewing Corp. Antitrust Litigation*, 441 F.Supp. 62, 69 (E.D.Mo.1977). Even where the details of the allegedly fraudulent acts are peculiarly within the adverse party's knowledge, Rule 9(b) still "requires that a plaintiff allege sufficient detail to demonstrate that his complaint is grounded in *some* facts." *McFarland v. Memorex Corp.*, 493 F.Supp. 631, 638–39 (N.D.Cal.1980) (emphasis in original). The "information and belief" allegations that defendants mailed false tax returns to IRS and false accounting statements to HCFA fail to meet this standard. Moreover, these allegations are made only with respect to the alleged scheme against the federal government. There are no allegations of mailed misrepresentations in the alleged scheme against the plaintiffs. The law is clear that plaintiffs need to allege two schemes involving mail fraud in order to allege a pattern of racketeering activity. Accordingly, even if the "information and belief" allegations of mailing false tax returns were adequate, the failure to allege any misrepresentation by mail in the first scheme is fatal.

Plaintiffs have also failed to allege matters such as the time, the place, or the content of the false representations relied on to establish fraud. "Plaintiffs must set out the contents of the letters and specify in what respect each of the statements were false and misleading, and the factual basis for believing that the defendants acted with intent to defraud." *Serig v. South Cook County Service Corp.*, 581 F.Supp. 575, 580 (N.D.Ill.1984); *see also Wright & Miller* Federal Practice & Procedure § 1297 n. 54 (1969 and Supp.1983). The plaintiffs in this case have not specified which statements by defendants they believe to be false or misleading, nor do they allege any factual basis for believing that defendants acted with an intent to defraud. Here, as in *Flowers*, the complaint "falls short of the specificity required by Fed.R. Civ.P. 9(b) when fraud is alleged," *Flowers*, 775 F.2d at 1054.

The complaint also fails to allege that the defendants acted with fraudulent intent in the alleged mailings. In order to allege a scheme to defraud within the meaning of § 1341, plaintiffs must establish that the defendants had the specific intent to defraud them. "The word 'scheme' connotes some degree of planning by the perpetrator and thus it must be proved that a defendant acted with intent to defraud." *DeMier*, 616 F.2d at 369.

Plaintiffs do not allege any fraudulent intent on the part of defendants. Plaintiffs allege only that defendants used the mails "with the intent to deprive plaintiffs of the ... Medicaid rates to which they were and are entitled under the AGI settlement and the Medicaid Act." Plaintiffs make the same accusation with regard to mailings of HCFA and OIG. These allegations are merely restatements of plaintiffs' breach of contract claim. Alleging that defendants intended to deprive them of the Medicaid rates to which plaintiffs believe they are entitled does not constitute a RICO claim.

Furthermore, plaintiffs do not allege that defendants acted with any intention of enriching themselves through the alleged schemes to defraud Beverly and the federal government. Even assuming that defendants acted improperly, they acted to protect the interest of Missouri taxpayers rather than to benefit themselves. These allegations do not make out a scheme to defraud within the meaning of § 1341. The Mail Fraud Statutes reaches only schemes "to deprive another of money or property by means of false or fraudulent pretenses, representations, or promises." *Carpenter v. United States*, 484 U.S. 19, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987).

Without allegations of instances of false representations or of a specific intent to defraud, plaintiffs have not established the most basic ingredient of mail fraud. In the absence of an adequately pled violation of the federal Mail Fraud Statute, plaintiffs have failed to allege the predicate acts of racketeering required to state a civil RICO claim.

The legislative history and court decisions interpreting RICO have made clear that the statute was intended to address the threat of continuing criminal activity, and not an isolated criminal event. The Supreme Court addressed RICO's requirement of a "pattern of racketeering activity" in footnote 14 of *Sedima*, 473 U.S. at 496, 105 S.Ct. at 3285. The Court looked to the statutory definition of that term, which states that a pattern "requires at least two acts of racketeering activity." The Court stated that while two acts are necessary,

they may not be sufficient, as the legislative history supported the view that two isolated acts would not constitute a pattern. The legislative history also made clear that RICO was not targeted at sporadic activity or the isolated offender, but at criminal activity which had the requisite "continuity plus relationship" to form a pattern. *Id.*

Following the Supreme Court's decision in *Sedima*, the Eighth Circuit held in *Superior Oil Company v. Fulmer*, 785 F.2d 252 (8th Cir.1986), that something more than a single scheme was required to establish a pattern of racketeering activity. The Court held that an isolated criminal episode could not supply the threat of continuing activity intended to be addressed by RICO without proof that any of the defendants had ever done those activities in the past or that they were engaged in other criminal activities elsewhere. "It places a real strain on the language to speak of a single fraudulent effort implemented by several fraudulent acts as a 'pattern of racketeering activity.'" *Id.* at 257. This multiple scheme requirement has been followed by numerous subsequent cases in this Circuit.

In response to the defendants' argument that plaintiffs have failed to allege two schemes, as required by *Superior Oil Co. v. Fulmer*, to satisfy RICO's "pattern" requirement, plaintiffs initially suggest that *Superior Oil* was wrongly decided and may be reversed by the Supreme Court in *H.J., Inc. v. Northwestern Bell Telephone Co.*, 829 F.2d 648 (8th Cir.1987), *cert. granted*, —— U.S. ——, 108 S.Ct. 1219, 99 L.Ed.2d 420 (1988). This response is a tacit admission that plaintiffs have failed to satisfy the *Superior Oil* test and recognize that their RICO claim can survive only if the Supreme Court rejects this test. This Court, however, is bound to apply Eighth Circuit precedent as it now stands.

RICO authorizes a private right of action for "[a]ny person injured in his business or property by reason of a violation of § 1962" of the Act. 18 U.S.C. § 1964. Section 1962(c), which plaintiffs invoke here, makes it unlawful for a person to engage in a "pattern of racketeering activi-

ty." A RICO plaintiff has standing only if "he has been injured in his business or property by the conduct constituting the violation." *Sedima*, 473 U.S. at 496–97, 105 S.Ct. at 3285. The conduct constituting a violation of § 1962(c) is a pattern of racketeering which, as defined by Eighth Circuit precedent, requires two schemes. Thus, to be injured "by reason of" a pattern of racketeering activity so as to have standing under § 1964, a plaintiff must be injured by both the schemes that comprise the pattern. In this case, the complaint alleges that plaintiffs were injured only by the first purported scheme against Beverly and not at all by the second purported scheme against the federal government.

In addition to this standing defect, the two alleged schemes are not separate and distinct at all, but are merely different aspects of the same transaction. For this additional reason, plaintiffs fail to allege a pattern of racketeering as that element has been construed by the Eighth Circuit. In arguing that the scheme to defraud the government is sufficient to meet the second scheme requirement, plaintiffs mischaracterize the decision in *Medical, Inc. v. Angicor, Ltd.*, 677 F.Supp. 1000 (D.Minn. 1988). Contrary to plaintiffs' reading of that case, the Court did not note "that the scheme to defraud the FDA was sufficiently differentiated [from the scheme to defraud plaintiff] to constitute a separate scheme." The Court never reached this question but pretermitted it by holding that FDA had no cognizable property interest in the export license that defendant allegedly attempted to obtain by fraud. *Id.* at 1005. The Court went only so far as to find that false submissions by mail to a federal agency can constitute racketeering activity, but did not comment on the question of whether such conduct constitutes an actionable pattern of racketeering activity. *Id.*

The Eighth Circuit also uses the enterprise prong of a RICO claim to establish the necessary continuity and prevent RICO from being used to attack sporadic, isolated incidents of alleged criminal activity. The Court has stressed that a RICO enterprise must have a separate and distinct existence apart from that necessary to commit the

alleged schemes which form the pattern of racketeering activity. In *United States v. Anderson*, 626 F.2d 1358 (8th Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981), the Court held that an association in fact under § 1961(4) encompasses "only an association having an ascertainable structure which exists for the purpose of maintaining operations directed toward an economic goal that has an existence that can be defined apart from the commission of the predicate acts constituting a 'pattern of racketeering activity.'" *Id.* at 1372. The same reasoning was subsequently adopted by the Supreme Court in *United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524, 2528, 69 L.Ed.2d 246 (1981), in holding that "'the enterprise' is not the 'pattern of racketeering activity;' it is an entity separate and apart from the pattern of activity in which it engages. The existence of an enterprise at all times remains a separate element which must be proved by the government."

Eighth Circuit cases have continued to hold that "under RICO, an enterprise cannot simply be the undertaking of the acts of racketeering, neither can it be the minimal association which surrounds these acts." *United States v. Bledsoe*, 674 F.2d 647, 664 (8th Cir.), *cert. denied* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1982). In *Bledsoe*, the Court held that the enterprise element required "proof of some structure separate from the racketeering activity and distinct from the organization which is a necessary incident to the racketeering." *Id. Bledsoe* required proof of three characteristics that distinguish a RICO enterprise: (1) a common or shared purpose, (2) an "ongoing organization" whose members function as a continuing unit, and (3) an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering activity. *Id.*

Plaintiffs have not alleged an enterprise that is separate and apart from the alleged racketeering activity. The complaint alleges that defendants Reagen, Moody, Miller, McClure and Rapps, together with MRI, and other unnamed state officials, formed an enterprise which was an association in

fact. Plaintiffs allege that the defendants were associated together for the purposes of carrying out the schemes which plaintiff claim are predicate acts of racketeering activity forming the RICO violation. Plaintiffs state that the enterprise is an ongoing informal organization, but do not allege that it serves any other functions than to carry out the alleged racketeering activities. Thus, the complaint fails to satisfy the enterprise requirement of RICO.

In light of the above analysis, it is clear that Count Nine of the plaintiffs' complaint must be dismissed for failure to state a claim upon which relief may be granted. Therefore, it shall not be necessary for the Court to address the issue of immunity.

### Claims Against the State

#### I. *Count One—Violation of Federal Contract Clause.*

In Counts I and II of the complaint, plaintiffs assert that the Emergency Amendment not only breached the alleged settlement agreement, but also violated the Contract Clauses of both the United States and Missouri Constitutions. In Count I, plaintiffs seek an injunction ordering defendants to perform their alleged obligations under the settlement agreement. In Count II, plaintiffs seek damages from the state for these alleged constitutional violations. It is the defendants' position in their motion to dismiss that the Emergency Amendment is not a "state law" for Contract Clause purposes. The Court agrees with this conclusion for the following reasons.

■■■ The Contract Clause of the United States Constitution provides, "[N]o state shall ... pass any ... law impairing the obligation of contracts." U.S. Const. Art. I, § 10. This section applies only to state, not federal, legislation. *Nachman Corp. v. Pension Benefit Guarantee Corp.,* 592 F.2d 947, 959 (6th Cir.), *reh'g denied* 448 U.S. 908, 100 S.Ct. 3051, 65 L.Ed.2d 1137 (1980). The plaintiffs claim in Count I of their complaint that the Emergency Amendment violated the Contract Clause. It is the conclusion of the Court, however, that the Emergency Amendment cannot be

fairly characterized as a "state law" within the meaning of Article I, § 10 of the United States Constitution. The enactment of the Emergency Amendment was an act of an Executive Branch agency rather than the state legislature. The Contract Clause restrains only state legislatures and not Executive Branch agencies. *Smith v. Sorensen,* 748 F.2d 427, 437 (8th Cir.1984). For this reason, even if the alleged settlement agreement created a contractual obligation with respect to certain reimbursement rates, plaintiffs' Contract Clause claims must be dismissed.

The Medicaid Act and HHS regulations require that a state Medicaid plan or an amendment to the plan receive federal approval from HCFA prior to implementation. 42 U.S.C. § 1396 (Supp. IV 1986); 42 C.F.R. § 447.258 (1987); 45 C.F.R. § 201.3 (1987). Participating states are required to consult with HCFA during the process of developing a state plan or proposing a significant change in the methods and standards by which the state reimburses Medicaid costs. *See* 42 C.F.R. §§ 447.253, 447.255 (1987). Federal consultation and approval are urged upon participating states by Congress and HHS because, in large share, Medicaid is a federal program. Sixty percent of the funds expended to cover the cost of care provided to Medicaid recipients in Missouri comes from federal financial participation (FFP) appropriated by Congress. HCFA has responsibility for overseeing this disbursement of federal funds.

In the present case, the impetus for promulgation of the Emergency Amendment was HCFA's disallowance of reimbursement rates paid to the plaintiff nursing homes following the settlement agreement. DOSS consulted with HCFA in developing an amendment to the state plan which would address the considerations that had led HCFA to disapprove these rates. As required by the federal government, the Emergency Amendment was finally approved by HCFA before becoming effective.

As stated by the defendants in their motion to dismiss, the promulgation of the Emergency Amendment was an administra-

tive, not a legislative, act. The prohibition in the federal Contract Clause "is aimed at the legislative power of the state, and not at ... the acts of administrative or executive boards or officers." *New Orleans Waterworks Co. v. Louisiana Sugar Refining Company*, 125 U.S. 18, 30, 8 S.Ct. 741, 747, 31 L.Ed. 607 (1888), *quoted in Smith v. Sorensen*, 748 F.2d 427, 436 (8th Cir.1984), *cert. denied* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 480 (1985). The Emergency Amendment was an administrative action by DOSS pursuant to its authority to execute the Medicaid laws. *See Sorensen*, 748 F.2d at 437. The Emergency Amendment had the effect of altering the alleged terms of DOSS's performance under the settlement agreement, thereby breaching the agreement according to the plaintiffs' complaint. Plaintiffs "have confused impairment of performance of a contract with impairment of the obligation of the contract. The United States Constitution does not provide federal action for simple breach of contract." *Id.* (quoting *Jackson Sawmill Co. v. United States*, 580 F.2d 302, 312 (8th Cir.1978), *cert. denied*, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979)).

 It is the conclusion of the Court that the Emergency Amendment is not a state law for Contract Clause purposes. Even if the Emergency Amendment were considered a state legislative enactment for Contract Clause purposes, plaintiffs have failed to state a claim under the federal Contract Clause. The federal Contract Clause does not prohibit all state laws which impair or even destroy pre-existing contractual obligations. *Exxon v. Eagerton*, 462 U.S. 176, 190, 103 S.Ct. 2296, 2305, 76 L.Ed.2d 497 (1983); *Burlington Northern Railroad v. Nebraska*, 802 F.2d 994, 1005 (8th Cir.1986). It does not prevent states from exercising their inherent police power to promote health, safety and public welfare. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410, 103 S.Ct. 697, 703–04, 74 L.Ed.2d 569 (1983).

The Supreme Court applied a three-step analysis to determine whether a state law violates the contract clause. *Burlington Northern Railroad*, 802 F.2d at 1006. First, the Court asks whether the law substantially impairs the contractual relationship. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704. The more severe the impairment, the more closely the Court will scrutinize the legislation. *Id.* The extent to which the industry involved is governmentally regulated is important in determining severity of impairment. *Burlington Northern Railroad*, 802 F.2d at 1006. In a heavily regulated industry, abrogation of contract by legislative act is not unusual, and, therefore, may not disrupt the reasonable expectations of contracting parties. *Energy Reserves Group*, 459 U.S. at 411, 103 S.Ct. at 704.

Second, if the state law does cause a substantial impairment of a contractual obligation, the Court asks whether the law serves a significant and legitimate public purpose. *United States Trust Co. v. New Jersey*, 431 U.S. 1, 22, 97 S.Ct. 1505, 1517, 52 L.Ed.2d 92 (1977). "The requirement of a legitimate public purpose guarantees that the state is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Group*, 459 U.S. at 412, 103 S.Ct. at 705. The Court looks to whether the law remedies an important, general social problem or whether it protects broad societal interests rather than the interests of a narrow class of particular individuals. *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 247–49, 98 S.Ct. 2716, 2723–24, 57 L.Ed.2d 727 (1978). Finally, the Court inquires into the means by which the state law achieves its public purpose. The law must be based "upon reasonable conditions and of a character appropriate to the public purpose justifying its adoption." *United States Trust Co.*, 431 U.S. at 22, 97 S.Ct. at 1518.

Applying this analysis to the Emergency Amendment, it is apparent that the Amendment is constitutional under the Contract Clause. As a threshold matter, under the Supreme Court approach, the Emergency Amendment has not substantially impaired the contractual relationship plaintiffs claim to have with DOSS. The Amendment allowed DOSS to preserve for plaintiffs to the extent possible, the rates plaintiffs

were receiving following the settlement. The Amendment allowed plaintiffs to avail themselves of any past rate increase to which they might otherwise have been entitled but had foregone because they were already receiving the highest rates permitted within their class, and the new rates gave plaintiffs the full benefit of the annual trend factors applied to other facilities' rates up to September 1, 1987.

Furthermore, the segment of the health care industry which participates in the provision of Medicaid benefits is heavily regulated by the federal and state governments. *Minnesota Association of Health Care Facilities v. Minnesota Department of Public Welfare,* 742 F.2d 442, 450 (8th Cir. 1984). Nursing homes that choose to participate in the Medicaid program cannot reasonably expect that the terms of any settlement agreement they may enter into will exempt them from all future rate regulation by state and federal authorities. "One whose rights, such as they are, are subject to state restriction, cannot remove them from the power of the state by making a contract about them." *Id.* at 449 (quoting *Hudson Water Co. v. McCarter,* 209 U.S. 349, 357, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908)); *accord Blue Cross Hospital Services, Inc. v. Frappier,* 681 S.W. 2d 925, 930 (Mo.1984) (en banc) ("persons cannot oust the state of its police power by making long-term contractual arrangements"). Thus, the "state law" at issue does not cause a substantial impairment of plaintiffs' contract—either in actual terms, or with respect to the disruption of reasonable expectations.

Even if the impairment were substantial, however, the state's interest in regulating the Medicaid reimbursement rates paid to participating health care providers supplies a legitimate public purpose for the Emergency Amendment. *See, e.g., Minnesota Association of Health Care Facilities,* 742 F.2d at 451. The regulation by DOSS of Medicaid reimbursement rates is an exercise of the state's police power to provide for the health and public welfare of its citizens. *Id.* at 449–50. Promulgation of the Emergency Amendment was a legitimate exercise of that police power, accord-

ing to the Supreme Court's analysis, because the Amendment benefits Missouri taxpayers as a whole rather than conferring any narrow benefit on a special interest. HCFA's deferral and imminent disallowance of its participation in the rates being paid to plaintiffs prior to the Emergency Amendment meant that the state would have to shoulder 100% of the excess portion of those rates if they were continued, thus reducing the funds available for other Medicaid services. This was a burden not in keeping with a state's decision to sponsor a joint federal-state program, and was intended by neither party when the 1985 settlement was reached. The significant and legitimate public purpose behind the Emergency Amendment of protecting the state's ability to make the best use of limited medical assistance dollars justifies its promulgation.

Finally, the means by which this legitimate public purpose was achieved were reasonable and appropriate. The Emergency Amendment preserved the most favorable rates for the plaintiffs that the federal government would allow. The Amendment did not exclude plaintiffs from participating in the Medicaid program or drastically reduce plaintiffs' reimbursement rate. Indeed, the Amendment represented the compromise with the federal government achieved by DOSS for the benefit of plaintiffs. Under this analysis, it is evident that plaintiffs have failed to state a claim for unconstitutional impairment of contract.

The plaintiffs cite two cases which hold that a Medicaid regulation violates the Contract Clause. These cases, however, are concerned with those portions of a statute that required retroactive restitution of money already paid to providers. *Minnesota Association of Health Care Facilities v. Minnesota Department of Public Welfare,* 742 F.2d 442, 451 (8th Cir.1984), *cert. denied,* 469 U.S. 1215, 105 S.Ct. 1191, 84 L.Ed.2d 337 (1985); *California Medical Association v. Lackner,* 117 Cal.App.3d 552, 566, 172 Cal.Rptr. 815, 824–25 (1981). By contrast, the Emergency Amendment promulgated by defendants provided only for the calculation of new Medicaid reim-

bursement rates on a prospective basis. Significantly, the Eighth Circuit in *Minnesota Association of Health Care Facilities*, held that prospective provisions of a Medicaid statute that impaired the plaintiffs' contractual relationships did not violate the Contract Clause. 742 F.2d at 450–51.

Because this Court has determined that the plaintiffs have failed to state a claim under Rule 12(b)(6) of Federal Rules of Civil Procedure concerning the Contract Clause of the United States and Missouri Constitutions, the Court shall not address the issue of Eleventh Amendment immunity as to this claim.

## II. *Count IV—The Boren Amendment Claim*

Count IV of the complaint alleges that the Emergency Amendment violates the federal Medicaid Act's provider reimbursement standard (the Boren Amendment) by paying plaintiff's rates that are below the minimum rates required by the Boren Amendment. Plaintiffs bring this cause of action under 42 U.S.C. § 1983, which creates an explicit cause of action for violation by state officials of federal statutory or constitutional rights. *Maine v. Thiboutot*, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). To state a cause of action under § 1983, plaintiffs must allege that the Medicaid rates paid to plaintiffs violate their statutory right, as efficiently and economically operated facilities, to be paid rates which are "reasonable and adequate to meet the cost which must be incurred by [such] facilities ..." 42 U.S.C. § 1396a(a)(13)(A).

The relief sought under Count IV includes (1) a declaratory judgment that the rates paid pursuant to the Emergency Amendment violate plaintiffs' rights under the Medicaid Act because the Emergency Amendment fails to pay rates in compliance with the Boren Amendment reimbursement standard; and (2) an injunction prohibiting defendants from reducing plaintiffs' rates "below those rates secured by the AGI settlement and mandated by the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A)."

In their motion to dismiss, defendants contend that the Boren Amendment establishes two exceptions to a private party's usual access to § 1983. In general, however, the law does not support the defendants' analysis. Any exceptions run contrary to the basic purpose of § 1983: to provide access to federal courts. Section 1983 creates an explicit cause of action to remedy violations of federal constitutional rights and federal law, and is intended to serve as a broad, remedial scheme, which is both alternative and supplementary to existing state remedies. *See, e.g., Patsy v. Board of Regents*, 457 U.S. 496, 506, 102 S.Ct. 2557, 2562–63, 73 L.Ed.2d 172 (1982). With this broad remedial purpose in mind, the courts have consistently rejected the state's attempts to limit the reach of § 1983. *See Felder v. Casey*, — U.S. —, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988) (rejecting imposition of state "notice of claim" statute or other exhaustion requirements on plaintiffs' bringing § 1983 actions in state courts).

■ Defendants' principal argument is that Congress has foreclosed plaintiffs' right to bring a cause of action under § 1983. The evidence of Congressional intent relied upon by defendants is HCFA's adoption of a state administrative appeal requirement. This is not persuasive, however, because Congressional intent cannot be inferred from HCFA regulations. Further, as the Supreme Court recognized in *Wright v. City of Roanoke Redevelopment & Housing Authority*, 479 U.S. 418, 107 S.Ct. 766, 770, 93 L.Ed.2d 781 (1987), "[t]he existence of a state administrative remedy does not ordinarily foreclose resort to § 1983." Further, the Supreme Court has held that exhaustion of state administrative remedies is not a prerequisite to action under the Civil Rights Act of 1871. *Patsy*, 457 U.S. at 501, 102 S.Ct. at 2560.

■ Defendants invoke a second exception to § 1983, arguing that the Boren Amendment does not confer rights on the plaintiffs which are enforceable in a § 1983 lawsuit. Defendants first suggest that providers do not have any enforceable rights under Medicaid. This position is not

supported by the case of *Nebraska Health Care Association v. Dunning*, 778 F.2d 1291, 1296 (8th Cir.1985), *cert. denied*, 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987). In *Dunning*, the Eighth Circuit found that the plaintiffs had the right to sue under § 1983. In that case, 34 providers were under-reimbursed due to the disputed provisions of the state plan. The Eighth Circuit confirmed that any state plan provision could be challenged if it adversely affected a "significant number" of facilities. *Id.* at 1293.

The defendants' attempt to distinguish *Dunning* by insisting that the *Dunning* lawsuit challenged the "reimbursement system" and "the validity of the entire system." In truth, however, the *Dunning* litigation involved a challenge to a single discreet provision of the state plan. *Dunning*, 778 F.2d at 1293. More pointedly, the Eighth Circuit confirmed the district court's finding that 34 providers had an "enforceable right" under Medicaid, and were entitled to relief under § 1983, because they were "economically and efficiently operated facilities," yet their Medicaid rates were too low.

The only question left after *Dunning* is how many economically and efficiently operated facilities must be adversely affected before the providers may bring suit in federal court. That question was answered in *West Virginia University Hospital, Inc. v. Casey*, 701 F.Supp. 496 (N.D.Pa.1988), where the court upheld an individual provider's complaint that the Pennsylvania Medicaid plan yielded rates to the plaintiff hospital (and the few other out-of-state providers participating in the Pennsylvania program who were not parties to the lawsuit), which violated the Boren Amendment. The court found that the state had violated the individual out-of-state hospitals' Boren Amendment rights, even though the state's Medicaid plan in general conformed with the federal law by reimbursing in state hospitals—accounting for virtually all providers participating in the Pennsylvania Medicaid program—at "reasonable and adequate" rates as required by the Boren Amendment.

In light of the above, it is clear to the Court that the plaintiffs have established a cause of action under the Boren Amendment. It is necessary, however, to address the issue of Eleventh Amendment immunity in conjunction with this claim.

The Eleventh Amendment of the United States Constitution bars plaintiffs' claims which seek retrospective monetary relief from the state's agencies and officers or injunctive relief based on state law. The Eleventh Amendment operates as a jurisdictional restriction on the federal courts. *Edelman v. Jordan*, 415 U.S. 651, 677–78, 94 S.Ct. 1347, 1362–63, 39 L.Ed.2d 662 (1974). The Supreme Court has consistently held that the amendment requires immunity for an unconsenting state from suits brought in federal courts by its own citizens as well as by citizens of another state. *Id.* at 662–63, 94 S.Ct. at 1355–56.

As interpreted by the Supreme Court, the line drawn by the amendment is bright and unmistakably strict: no federal court may hear "a suit by private parties seeking to impose a liability which must be paid from public funds in the state treasury." *Id.* at 663, 94 S.Ct. at 1356. It is well-established that the Eleventh Amendment bar extends to suits brought against state agencies and against state officials where the state is the real, substantial party in interest. *Id.*

The Supreme Court has also established that the amendment precludes any claim asserted in federal court against state officers based on alleged violations of state law, whether such claim seeks retrospective monetary relief or prospective relief in any form, when the relief sought has an impact directly on the state itself. *Pennhurst State School & Hospital v. Halderman (Pennhurst II)*, 465 U.S. 89, 106, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984). Thus, even equitable relief based on state law—such as an order directed at state officers requiring specific performance of a contract to which the state is a party—will be barred. *In re Ayers*, 123 U.S. 443, 502–06, 8 S.Ct. 164, 181–83, 31 L.Ed. 216 (1887).

The only kinds of claims exempt from the Eleventh Amendment bar are (1) claims against state officers sued in their official capacities where the relief sought is *prospective* in nature and is based on an ongoing violation of the plaintiffs' federal constitutional or statutory rights, *Ex parte Young*, 209 U.S. 123, 159–60, 28 S.Ct. 441, 453–54, 52 L.Ed. 714 (1908); and (2) claims against state officers sued in their individual capacities for alleged violations of federal rights, where these claims in reality seek to impose personal liability, *Scheuer v. Rhodes*, 416 U.S. 232, 238, 94 S.Ct. 1683, 1687, 40 L.Ed.2d 90 (1974). In addition to these claims, there are only two instances in which the amendment will not apply: a state may waive its Eleventh Amendment immunity, or Congress may abrogate the immunity with respect to the rights protected by the Fourteenth Amendment.

In the present case, the plaintiffs have asked for a declaratory judgment that the rates paid pursuant to the Emergency Amendment violate plaintiffs' rights under the Medicaid Act because the Emergency Amendment fails to pay rates in compliance with the Boren Amendment reimbursement standard; and (2) an injunction prohibiting defendants from reducing plaintiffs' rates "below those rates secured by the AGI settlement and mandated by the Medicaid Act, 42 U.S.C. § 1396a(a)(13)(A)." To the extent that the relief requested is prospective, the plaintiffs may proceed on this claim. The Eleventh Amendment bars any compensation for a remedy for past violations.

## III. *Count V—Procedural Violation of HHS Regulations*

In Count V, plaintiffs' claim that defendants failed to comply fully with HHS regulations that require state Medicaid agencies seeking "HCFA approval of a significant state plan change in payment methods and standards" to make certain "assurances satisfactory to HCFA." *See* 42 C.F.R. §§ 447.253, 447.255. Specifically, plaintiffs confine their claim to an alleged failure to submit the "related information" required by § 447.255(b). Plaintiffs allege that this failure to submit certain information rendered HCFA's approval of the Emergency Amendment invalid and that defendants' implementation of the amendment without valid approval violated plaintiffs' procedural rights purportedly "secured under the Medicaid Act." Under § 1983, plaintiffs seek a declaratory judgment that the Emergency Amendment is void and an order requiring defendants Reagen and Kruse, both in their official capacities, DOSS and Medical Services to reimburse plaintiffs for losses incurred as a result of this procedural violation.

Count V states a cause of action for defendants' failure to comply with the mandatory procedural requirements for submitting state Medicaid plan amendment containing "significant changes" to HCFA for approval, as required by 42 C.F.R. §§ 447.253 and 447.255. In accordance with the governing case law of the Eighth Circuit, plaintiffs have requested that defendants be enjoined from applying the Emergency Amendment because defendants failed to submit all of the required "related information" in seeking HCFA's approval of the Emergency Amendment to the state's Medicaid plan. *See Dunning*, 778 F.2d at 1294.

It is the conclusion of this Court that the plaintiffs have properly stated a cause of action for violation of the federal Medicaid Act's procedural requirements. It would be inappropriate for the Court to decide disputed factual issues on a motion to dismiss. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972) (*per curiam*). The issues raised by the defendants in their motion to dismiss Count V are not appropriate for resolution on a Rule 12(b)(6) motion. Therefore, Count V must stand as pleaded.

The Court notes that the plaintiffs have requested an injunction and a declaratory judgment in Count V. The Eleventh Amendment does not bar these claims to the extent that they are requesting prospective relief. Therefore, this Count shall be allowed to proceed as pleaded.

Accordingly, it is hereby

ORDERED that Count III of plaintiffs' First Amended Complaint shall be dismissed with prejudice. It is further

ORDERED that Count VI of plaintiffs' First Amended Complaint shall be dismissed with prejudice. It is further

ORDERED that Count VII of the plaintiffs' First Amended Complaint shall be dismissed with prejudice. It is further

ORDERED that Count VIII of the plaintiffs' First Amended Complaint shall be dismissed with prejudice. It is further

ORDERED that Count IX of the plaintiffs' First Amended Complaint shall be dismissed with prejudice. It is further

ORDERED that Counts I and II of the plaintiffs' First Amended Complaint shall be dismissed with prejudice. It is further

ORDERED that defendants' motion to dismiss shall be denied as to Counts IV and V.